902 A.2d 226

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JUSTIN BEALOR, DEFENDANT–RESPONDENT.

Argued May 1, 2006—Decided July 20, 2006.

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for appellant (*Zulima V. Farber,* Attorney General of New Jersey, attorney).

*Brian S. O'Malley* argued the cause for respondent.

Justice RIVERA–SOTO delivered the opinion of the Court.

*N.J.S.A.* 39:4–50 does not prohibit solely the "operat[ion of] a motor vehicle while under the influence of intoxicating liquor[.]" The driving while intoxicated statute also prohibits the "operat[ion of] a motor vehicle while under the influence of ... narcotic, hallucinogenic or habit-producing drug[s.]" Framed in the latter context, this appeal requires that we address whether lay opinion is sufficient to prove the offense of driving while intoxicated when

the intoxicating agent is marijuana and not alcohol, or whether additional expert opinion is required.

We hold that, although evidentially competent lay observations of the fact of intoxication are always admissible, lay opinion in respect of the cause of intoxication other than from alcohol consumption is not admissible because, unlike alcohol intoxication, "[n]o such general awareness exists as yet with regard to the signs and symptoms of the condition described as being 'high' on marihuana." *State v. Smith,* 58 *N.J.* 202, 213, 276 *A.*2d 369 (1971). However, we further hold that competent lay observations of the fact of intoxication, coupled with additional independent proofs tending to demonstrate defendant's consumption of narcotic, hallucinogenic or habit-producing drugs as of the time of the defendant's arrest, constitute proofs sufficient to allow the fact-finder to conclude, without more, that the defendant was intoxicated beyond a reasonable doubt and, thereby, to sustain a conviction under *N.J.S.A.* 39:4–50.

## I.

The transcripts of the trial held in the Municipal Court disclose that, during the early morning hours of July 11, 2002, defendant Justin Bealor was driving in Sea Isle City, Cape May County, when his erratic driving caught the attention of State Police Troopers Michael Donahue and Jason Innella.[1] According to Donahue, he and Innella were traveling behind defendant's car and observed it "weaving across the double lines, several times." Defendant then turned east onto JFK Boulevard, a divided road, but was traveling in the westbound lanes, into what would have been on-coming traffic. Donahue and Innella turned on to the eastbound lanes of JFK Boulevard and followed defendant "until there was a break in the median." At that point, Donahue and Innella crossed over into the westbound lanes and defendant,

---

[1] There is a stenographic error in the trial transcript that mistakenly refers to Trooper Innella as "Ianella."

having noticed he was being followed by the police, pulled his car into a parking lot. Donahue and Innella pulled up behind him and activated their signal lights "to initiate a motor vehicle stop."

Donahue described the events that followed:

> At that point, Trooper [Innella] approached the driver's side of the vehicle. I approached the passenger side. We both observed that there was a twelve pack of [beer] cans in the back of the car. They were obviously fresh. We could see the condensation on the twelve—on the cans. The twelve pack was actually ripped open.
>
> . . . .
>
> [A]s we approached the car, [defendant] opened up the driver door and at that time he stated, window doesn't open, sorry. Immediately, Trooper [Innella], he [signaled] to me that [defendant] had been drinking. You know, as you got close to [defendant] you could smell the alcohol was emanating from himself. It was emanating from the inside of the vehicle. You could also smell burnt marijuana. His eyes were bloodshot and glassy. His eyelids drooped down. His face was pale and flushed. He identified himself as Justin Bealor, and he fumbled around in the center console and his glovebox searching for all his credentials.

In response to Innella's question whether he had been drinking, defendant admitted that he "only drank a couple beers." As he exited the car at Innella's request, defendant "just seemed a little bit lost" and "he spoke very slow and very slurred."

After defendant was out of the car, Donahue and Innella were able to observe defendant and his appearance fully. According to Donahue, defendant's "clothes were all messy and muss—it actually looked like he had been sleeping and woke up. His person was very mussed and muffled." Donohue noted that "[y]ou could smell the odor of alcohol and marijuana on him. Again, his eyes were droopy. His knees sagged a little bit as he stood. He had an emotionless stare on his face."

Donahue explained that, after defendant recited the alphabet as part of the field sobriety test, "for our safety and [defendant]'s safety, Trooper [Innella] conducted a pat down for weapons" and discovered, in defendant's rear pocket, "a multi-colored smoking pipe with marijuana residue in it." Upon the discovery of the

pipe, defendant was arrested and advised of his *Miranda* [2] rights. He was then transported to the State Police Barracks in Woodbine, where defendant again was advised of his *Miranda* rights, he signed a card indicating that those rights had been read to him, and he agreed to submit to chemical sobriety tests.

Defendant then submitted to two breathalyzer tests. Once he did so, his demeanor changed. Donahue testified that "[a]fter the breath tests he just became more and more agitated" and that defendant started to use profanity against Donahue. While defendant was providing a urine sample at Donahue's request, "[h]e became even more agitated" to the point where Donahue "had to actually physically restrain him and push him up against the wall and tell him to calm down." Defendant, while providing the urine sample, continued his stream of invectives addressed to Donahue, to which defendant added profane gestures.

After securing defendant's urine sample, Donahue returned defendant to the bench in the processing room, where defendant was secured while Donahue and Innella sought to complete their paperwork. Donahue's description of defendant's demeanor during that period is telling:

Throughout the rest of the time that he was there, he just—he created a general disturbance in the station. He interrupted troopers as they tried to walk past him. He continually interrupted us while we were trying to finish our paperwork, asking when he would be taken home. Despite the fact that we explained to him several times that we're trying to finish processing him as fast as possible. We also tried several times to contact someone at home [to] pick him up at the station, but he couldn't provide us with anyone with a phone number. He just stated that his brother was at home in Strathmere, but they didn't have a phone for him to call him on. So myself and [Innella] transported him to a residence in Strathmere. While transporting him back, he lectured myself and [Innella] on the fact that police officers are not trustworthy. That we abuse our power. And then once we got—once we actually came to the residence that we were dropping him off at, we knocked on the door and made contact with his brother, Kevin Bealor. While we were explaining the potential liability warning [3] to [defendant]'s brother, [defen-

---

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

[3] In 2001, the Legislature adopted L. 2001, *c.* 69 in response to a tragic incident in July 2000 when a driver arrested for driving while intoxicated was

dant] was in the back seat of the troop car. He was banging on the window and just yelling for us to let him out. [Defendant]'s brother then signed the potential liability warning and [defendant] was released into his custody and they both went inside the residence.

Donahue explained that defendant's vehicle "was towed from the scene, reference John's Law[.]"[4] Donahue also established the chain of custody in respect of the "multi-colored smoking pipe" seized from defendant at the time of his arrest, which was later referred to as a "glass pipe," as well as that of the urine sample provided by defendant at the State Police Barracks.

The first questions asked of Donahue on cross-examination fairly captured his observations of defendant's state:

Q. Is it fair to say that [defendant] was a royal pain in the neck for you and the other officers that night?

A. It's fair to say that he was intoxicated, not himself.

Q. All right. Okay. That's your conclusion?

A. Yes, sir.

Addressing defendant's demeanor, the cross-examination underscored Donahue's direct testimony that defendant was not cooperative and that his speech, while understandable, was slurred.

The State also presented the testimony of Michael Kennedy and Lynn. Van Camp, two forensic scientists employed by the State Police. Kennedy tested the urine sample defendant provided and concluded that "the two tests that I did confirm that there was

---

released by the police to the custody of a friend. That friend immediately returned the intoxicated driver to his car and each went their separate ways. Shortly thereafter, the intoxicated driver collided with a car driven by Navy Ensign John R. Elliott, who had graduated from the United States Naval Academy at Annapolis just two months before, killing himself and Elliott and severely injuring Elliott's passenger.

Commonly known as "John's Law," the two operative sections of *L.* 2001, *c.* 69 have been codified: Section 1, now *N.J.S.A.* 39:4–50.22, requires that the police issue responsibility warnings to those who assume custody of a person arrested for driving while intoxicated; and Section 2, now *N.J.S.A.* 39:4–50.23, authorizes the arresting law enforcement agency to impound the vehicle operated by a person arrested for driving while intoxicated for a period of twelve hours.

[4] *See* footnote 3, *supra*.

marijuana metabolite present in the urine." Kennedy explained that marijuana metabolite is "a psychoactive ingredient in marijuana, what causes the intoxication is THC and you don't actually see that in the marijuana. We look for the metabolite of that compound and the metabolite that I found was the THC metabolite, and it's THCC ... the chemical name for the compound." Van Camp tested the glass pipe retrieved from defendant when he was arrested and concluded that "[t]he burnt vegetation found in the glass smoking pipe was, in fact, marijuana[.]"

Save for the cross-examination of the State's witnesses, defendant did not proffer a defense.[5] Instead, defendant argued that "marijuana intoxication really cannot be proven without an expert [in respect of] intoxication by drugs at the time of the event." The municipal court rejected that argument, observing that defendant's urine sample taken at the State Police Barracks showed the presence of marijuana metabolite and "[t]here is no requirement that I'm aware of, unless you can show me otherwise, that the State has to show how much marijuana was in someone's system to be considered under the influence." Distinguishing this case from *State v. Tiernan,* 123 *N.J.Super.* 322, 302 *A*.2d 561 (Cty.Ct. 1973), *overruled on other grounds by State v. Tamburro,* 68 *N.J.* 414, 421, 346 *A*.2d 401 (1975), the municipal court noted that, in this case, the State had presented evidence both of the fact of intoxication (through the testimony of Donahue), and the cause of the intoxication (through the testimony and opinions of the qualified forensic scientists).

As a result, the municipal court found defendant guilty of operating a motor vehicle while under the influence of marijuana,

---

[5] Although defendant attended the first day of his two-day municipal court trial, defendant was unable to attend the second day, which was held three months later. As a result, by the time the prosecution rested its case, defendant was not available to testify. For that reason, the municipal court disregarded all of defendant's statements to the police officers as proof of intoxication and relied, instead, solely on Donahue's observations of defendant's demeanor. It was represented, however, that, had defendant testified, he would have denied many of the statements Donahue attributed to defendant.

in violation of *N.J.S.A.* 39:4–50 [6], and sentenced defendant to the minimum penalties permitted, which included a six-month loss of driving privileges, fines, court costs, penalties and surcharges.

On a *de novo* appeal to the Law Division, defendant argued that "[t]here was no indication that [Donahue] has any special training relative to drugs, narcotics" and that, as a result, it would be "a leap of faith" to conclude that "having some substance in your urine [means] being under the influence of it." Defendant's "primary argument [was] that based on the lack of expert testimony here, not the expert testimony that said he had the [marijuana] metabolites [in his system] but anything about the effect of that metabolite on the individual, there cannot be a finding of guilt." Defendant argued that "[r]ecognizing someone being under the influence of marijuana versus some other narcotic drug or under [the influence of] alcohol is something the lay person can't do."

Based on defendant's presentation on appeal, the Law Division concluded that "[t]he real issue ... raised is the necessity of an

---

[6] Defendant also received three additional citations concerning the events of July 11, 2002. These charged defendant with improperly operating a motor vehicle on a divided highway, in violation of *N.J.S.A.* 39:4–82.1, careless driving, in violation of *N.J.S.A.* 39:4–97, and operating a motor vehicle while knowingly possessing marijuana, in violation of *N.J.S.A.* 39:4–49.1. The municipal court explained that, because there were sufficient proofs to convict defendant on both the improper operation on a divided highway charge and the careless driving charge, the municipal court would only find defendant guilty of one and allowed defense counsel to choose which. Defense counsel selected the improper operation on a divided highway charge. Hence, the municipal court convicted defendant of the improper operation on a divided highway charge and dismissed the careless driving charge. In addition, the municipal court and the municipal prosecutor agreed that, because the marijuana found in the glass pipe amounted only to trace evidence, there was insufficient evidence to convict defendant of the charge of operating a motor vehicle while knowingly possessing marijuana; that citation too was dismissed. We express no opinion in respect of the propriety or correctness of any of those determinations.

Defendant did not appeal his conviction for improper operation of a motor vehicle on a divided highway. Therefore, we restrict our discussion solely to defendant's conviction for driving while intoxicated.

expert to testify as to the defendant's level of intoxication."
Addressing that issue squarely, the Law Division found that

> under these circumstances there is no necessity for an expert. Had it been merely
> the presence of metabolites, yes, there would have been absolutely a need for
> someone to interpret the test results and provide the Court with essentially
> circumstantial evidence of intoxication. But that was not necessary here because
> in addition to the urine screen you had the improper driving that was more than
> just say a slight crossing over the line.... The smell of marijuana in the car the
> smell of marijuana on the person, the smell of marijuana on the marijuana pipe.
> The appearance of the defendant. His conduct while in the station.... Because of
> all of the circumstances that were present I find that there was in this case no
> necessity for expert testimony. I find that the State presented sufficient proofs to
> meet a beyond a reasonable doubt standard that the defendant was operating
> under the influence of marijuana on the night in question.

The Law Division reimposed the municipal court's sentence.

The Appellate Division reversed. *State v. Bealor,* 377 *N.J.Super.* 321, 872 *A.*2d 1081 (App.Div.2005). According to the panel,
"[t]he State failed to present any evidence of the quantity of
marijuana metabolites in defendant's urine, nor did the State
present any evidence linking defendant's driving or post-arrest
conduct with marijuana intoxication." Id. at 327, 872 *A.*2d 1081.
Noting that "[m]arijuana intoxication ... is not a matter of
common knowledge such that an inference of intoxication may be
drawn solely from a lay witness's testimony respecting defendant's
behavior[,]" *Id.* at 329, 872 *A.*2d 1081 (citing *State v. Smith,* 58
*N.J.* 202, 213, 276 *A.*2d 369 (1971)), the Appellate Division conclud-
ed that "a per se rule cannot be applied to a [driving while
intoxicated] charge involving marijuana in the absence of any
evidence as to the effect of marijuana on defendant's behavior or
physical appearance." *Id.* at 330, 872 *A.*2d 1081 (footnote omit-
ted). Based on that conclusion, the panel held that it had "no
evidence ... from which to infer that defendant was under the
influence of marijuana *while he was driving.*" *Id.* at 331, 872 *A.*2d
1081. The Appellate Division explained that

> if the State had produced expert testimony—or even lay testimony from the
> trooper based upon his training, knowledge and experience—respecting the effects
> of marijuana intoxication on defendant's behavior, physical appearance and condi-
> tion, it would have met its burden of proving beyond a reasonable doubt that

> defendant was driving under the influence of marijuana. It did not, and we are, therefore, constrained to reverse the conviction.
>
> [*Ibid.*]

We granted the State's petition for certification, *State v. Bealor*, 185 *N.J.* 265, 883 *A.*2d 1061 (2005), and, for the reasons that follow, we reverse the judgment of the Appellate Division, and reinstate defendant's conviction for driving under the influence of marijuana.

## II.

The State argues two principal points. First, the State argues that marijuana intoxication, akin to alcohol intoxication, is "a sufficiently common condition so as to properly be the subject of lay witness testimony." Translated into the language of *N.J.R.E.* 701, the State's claim is that lay opinion testimony in respect of marijuana intoxication is admissible because "it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness'[s] testimony or in determining a fact in issue." Next, the State argues that, because there is no generally accepted scientific standard by which to measure marijuana intoxication, the Appellate Division's decision requires proofs that are impossible to proffer.

Defendant categorically rejects the State's claim that marijuana intoxication is a proper subject for lay opinion testimony and asserts that it must be the subject of proper expert opinion testimony. Defendant notes that, under the Appellate Division's decision, the State had the opportunity to satisfy its burden of proof simply by qualifying Donahue, by virtue of his training and experience, as an expert, and that the State failed to do so. According to defendant, because "[n]o expert testimony was presented as to the effects of marijuana, nor was any testimony provided as to the amount of marijuana metabolite found, nor any indication of how long such substance would remain in the urine after marijuana was consumed or entered the bodily system

through second-hand smoke[,]" this "case represents a simple failure of proof[.]"

### III.

Since 1924, because sobriety and intoxication are matters of common observation and knowledge, New Jersey has permitted the use of lay opinion testimony to establish alcohol intoxication. *Searles v. Pub. Serv. Ry. Co.*, 100 *N.J.L.* 222, 223, 126 *A.* 465 (Sup.Ct.1924). Founded on that premise, lay opinion consistently has been admitted to prove that a defendant was "operat[ing] a motor vehicle while under the influence of intoxicating liquor" in violation of *N.J.S.A.* 39:4–50, the driving while intoxicated statute. *See, e.g., State v. Cryan*, 363 *N.J.Super.* 442, 454–56, 833 *A.*2d 640 (App.Div.2003) (holding that observations of police officers and paramedic, together with defendant's statements, were sufficient to prove alcohol intoxication even in absence of expert proofs); *State v. Guerrido*, 60 *N.J.Super.* 505, 511, 159 *A.*2d 448 (App.Div. 1960) ("[T]here is ... no persuasive reason to hold that a state of [alcohol] intoxication of the degree contemplated by *N.J.S.A.* 39:4–50 cannot factually be established by lay evidence. [T]he average witness of ordinary intelligence, although lacking special skill, knowledge and experience but who has had the opportunity of observation, may testify whether a certain person was sober or intoxicated."); *State v. Pichadou*, 34 *N.J.Super.* 177, 180, 111 *A.*2d 908 (App.Div.1955) (holding that in prosecution for driving while intoxicated, "[i]t is not to be doubted that the average witness of ordinary intelligence, although lacking special skill, knowledge and experience but who has had the opportunity of observation, may testify whether a certain person was sober or intoxicated. Neither our statutory law nor any procedural rule requires the testimony of medical experts in the prosecution of offenses of this nature.").

This appeal requires that we explore a related question: whether, similar to alcohol intoxication, intoxication arising as a result of the consumption of narcotic, hallucinogenic or habit-producing

drugs also can be proved by lay opinion, or whether additional proofs are required.

## A.

 *N.J.R.E.* 701 sets forth the prerequisites for the admission of lay opinion testimony; the *Rule* provides that

"[i]f a witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness'[s] testimony or in determining a fact in issue."

We have made clear that "[t]he purpose of *N.J.R.E.* 701 is to ensure that lay opinion is based on an adequate foundation." *Neno v. Clinton,* 167 *N.J.* 573, 585, 772 *A.*2d 899 (2001). Thus, we have held in a variety of circumstances, *see id.* at 582, 772 *A.*2d 899 (collecting cases), that "[a] lay witness may give an opinion on matters of common knowledge and observation." *State v. Johnson,* 120 *N.J.* 263, 294, 576 *A.*2d 834 (1990) (citing *State v. LaBrutto,* 114 *N.J.* 187, 197, 553 *A.*2d 335 (1989)).

However, nothing in *Rule* 701 relieves "the obligation of a party to meet the requirements of a rule of law that the fact be proved either by a preponderance of the evidence or by clear and convincing evidence or beyond a reasonable doubt, as the case may be." *N.J.R.E.* 101(b)(1). We have repeatedly made clear that, in motor vehicle violation cases, the State's burden of proof unquestionably is beyond a reasonable doubt. *State v. Fearon,* 56 *N.J.* 61, 62, 264 *A.*2d 446 (1970) (*per curiam* ); *State v. Cummings,* 184 *N.J.* 84, 98–99, 875 *A.*2d 906 (2005) (extending beyond a reasonable doubt standard of proof to prosecutions under the Refusal Statute, *N.J.S.A.* 39:4–50.4a). Therefore, we must examine whether the record in this case contains sufficient proofs to sustain the State's burden of proving that marijuana intoxication is now a matter of common knowledge and observation. We conclude that it does not. For that reason, we decline the State's invitation that we overrule the extant proscription against lay opinion testimony in respect of marijuana intoxication.

In *State v. Smith*, 58 *N.J.* 202, 213, 276 *A.*2d 369 (1971), we explained that "[a]n ordinary citizen is qualified to advance an opinion in a court proceeding that a person was intoxicated because of consumption of alcohol. The symptoms of that condition have become such common knowledge that the testimony is admissible." At that time, we further held that "[n]o such general awareness exists as yet with regard to the signs and symptoms of the condition described as being 'high' on marihuana." *Ibid.* Although much has changed in the intervening years since our decision in *State v. Smith*, the passage of time alone does not relieve a party of its burdens of proof and persuasion. In this case, the State had the burden of creating a proper record from which a fair determination could be made that the symptoms of marijuana intoxication "have become such common knowledge that [lay opinion] testimony [that a person was intoxicated because of the consumption of marijuana] is admissible."

The factual record before us consists of the trial testimony of the police officer who arrested defendant and the two forensic scientists who tested defendant's urine and the glass pipe seized from defendant. The State did not tender any proofs at any stage of these proceedings to show that there is now a general awareness of the indicia or symptoms of marijuana intoxication. It was not until it sought certification before this Court that the State referenced any sources for the proposition it now advances, and then only as "other sources cited" in support of its legal argument. However, to take the step the State invites us to take, our adversary system requires more: factual proofs presented to a fact-finder tempered by the fire of confrontation, cross-examination and adverse proofs. We are, therefore, constrained from reaching the threshold issue pressed by the State.

### B.

Having rejected the State's invitation to place lay opinion testimony regarding marijuana intoxication on the same footing as lay opinion testimony as to alcohol intoxication, we must address

whether, in the absence of lay opinion testimony, the evidence tendered here was sufficient to prove that defendant was under the influence of marijuana while he operated a motor vehicle. Relying on the aggregate of factual observations of defendant's demeanor and physical appearance together with expert proofs that confirmed the presence of a "narcotic, hallucinogenic or habit-producing drug" in defendant's system at the time of his arrest, the municipal court and the Law Division separately concluded that defendant operated his motor vehicle while he was under the influence of marijuana. The Appellate Division concluded that those proofs were insufficient because the State had failed to prove, through expert opinion, that "defendant was under the *influence of marijuana* while he was driving." *State v. Bealor,* 377 *N.J.Super.* 321, 331, 872 *A.*2d 1081 (App.Div.2005). We disagree.

█ The driving while intoxicated statute expresses the Legislature's desire to prohibit driving while intoxicated; whether the cause of intoxication is alcohol or narcotics, hallucinogens or habit-forming drugs is largely irrelevant. In respect of alcohol, *N.J.S.A.* 39:4–50 prohibits generally the "operat[ion of] a motor vehicle while under the influence of intoxicating liquor" and specifically presumes a violation whenever a person "operates a motor vehicle with a blood alcohol concentration of 0.08% or more by weight of alcohol in the defendant's blood[.]" Expert proofs are not a necessary prerequisite for a conviction for driving while under the influence of alcohol. Thus, for example, even in the absence of expert proofs of a defendant's blood alcohol concentration, a conviction for driving while under the influence of alcohol will be sustained on proofs of the fact of intoxication—a defendant's demeanor and physical appearance—coupled with proofs as to the cause of intoxication—*i.e.,* the smell of alcohol, an admission of the consumption of alcohol, or a lay opinion of alcohol intoxication. *See State v. Cryan,* 363 *N.J.Super.* 442, 454–55, 833 *A.*2d 640 (App.Div.2003) (sustaining conviction for driving while intoxicated based on proofs of defendant's bloodshot eyes, hostility and strong odor of alcohol); *State v. Cleverley,* 348 *N.J.Super.* 455,

465, 792 A.2d 457 (App.Div.2002) (sustaining conviction based on defendant's "driving without his headlights on" and police officer's observations of defendant's "strong odor of alcohol on defendant's breath[,]" "swaying as he walked[,]" inability to perform physical coordination test, slurred speech, and combativeness); *State v. Oliveri,* 336 *N.J.Super.* 244, 251–52, 764 A.2d 489 (App.Div.2001) (sustaining conviction on "alternative basis" of proofs that "defendant's eyes were watery and his speech slow and slurred[;]" defendant's inability to follow commands, defendant's admission of alcohol consumption earlier that day, defendant's staggering when walking, and defendant's failure to complete successfully various physical coordination tests); *State v. Bryant,* 328 *N.J.Super.* 379, 383, 746 A.2d 44 (App.Div.2000) (holding that "the prosecutor could have proceeded on the driving under the influence charge by utilizing evidence other than the breathalyzer results.").

 By the same token, the driving while intoxicated statute "does not require that the particular narcotic[, hallucinogen or habit-producing drug] be identified." *State v. Tamburro,* 68 *N.J.* 414, 421, 346 A.2d 401 (1975). The statute also does not define the quantum of narcotics, hallucinogens or habit-producing drugs required in order to violate its prohibition. Instead, as with alcohol intoxication, the issue is simple: was the defendant "under the influence" of a narcotic, hallucinogen or habit-producing drug while he operated a motor vehicle.

We have described generally the term "under the influence" as "a substantial deterioration or diminution of the mental faculties or physical capabilities of a person whether it be due to intoxicating liquor, narcotic, hallucinogenic or habit producing drugs." *Ibid.* We also have explained that the term "under the influence" means "a condition which so affects the judgment or control of a motor vehicle operator as to make it improper for him to drive on the highway." *Ibid.* (citing *State v. Johnson,* 42 *N.J.* 146, 165, 199 A.2d 809 (1964)). In the specific context of narcotic, hallucinogenic or habit-producing drug intoxication, we have held that a driver is "under the influence of a narcotic drug . . . if the drug produced

a narcotic effect 'so altering his or her normal physical coordination and mental faculties as to render such person a danger to himself as well as to other persons on the highway.' " *Ibid.* (quoting *State v. DiCarlo*, 67 *N.J.* 321, 328, 338 *A*.2d 809 (1975)). The question then is whether the proofs adduced in this case are sufficient to establish beyond a reasonable doubt that, at the time of his arrest, defendant suffered from "a substantial deterioration or diminution of the mental faculties or physical capabilities[,]" or was in a drug-induced state that "so affect[ed his] judgment or control . . . as to make it improper for him to drive on the highway[,]" or whether defendant was under the effect of a drug that "so alter[ed] his . . . normal physical coordination and mental faculties as to render [defendant] a danger to himself as well as to other persons on the highway."

Under any of those standards, the State proved beyond a reasonable doubt that defendant "operate[d] a motor vehicle while under the influence of . . . narcotic, hallucinogenic or habit-producing drug[s]" in violation of *N.J.S.A.* 39:4–50. Even if limited solely to the time of his arrest, the fact of defendant's intoxication was amply proved by Donahue's fact testimony in respect of defendant's erratic and dangerous driving, his slurred and slow speech, his "bloodshot and glassy" eyes, his droopy eyelids, his "pale and flushed" face, his "fumbl[ing] around the center console and his glovebox searching for all his credentials," the smell of burnt marijuana on defendant, his sagging knees and the "emotionless stare on his face." Also, on cross-examination, Donahue testified without objection that defendant was intoxicated at the time of his arrest. Finally, the State incontrovertibly proved, through qualified experts, the presence of marijuana in defendant's blood stream at the time of the arrest and its likely source.

The aggregate of those proofs was more than sufficient to permit the fact-finder to conclude, beyond a reasonable doubt, that defendant violated the driving while intoxicated statute. As in the context of driving while under the influence of alcohol cases, we reject the Appellate Division's restriction on the logical and infer-

ential ability of the fact-finder to connect the objective facts of intoxication with the proven presence of a cause of intoxication in order to conclude that defendant drove while intoxicated. We also reject the notion that a conviction for driving under the influence of a narcotic, hallucinogen or habit-producing drug must be based *exclusively* on proofs of "the subject's conduct, physical and mental condition and the symptoms displayed" together with "a qualified expert ... determin[ing] that he or she is 'under the influence' of a narcotic." *State v. Tamburro*, 68 *N.J.* 414, 421, 346 *A.2d* 401 (1975). On the contrary, we acknowledge that

> [t]he thrust of the Motor Vehicle Act is safety on the highway. The particular section is addressed to the evil of operating a motor vehicle while one's physical coordination or mental faculties are substantially diminished by "intoxicating liquor, narcotic, hallucinogenic or habit-producing drug." Competency to operate a motor vehicle safely is the critical question.
>
> [Id. at 422, 346 *A.2d* 401.]

The rule adopted by the panel—that the nexus between the facts of intoxication and the cause of intoxication can only be proved by expert opinion—impermissibly impinges on the traditional role of the fact-finder and is explicitly disavowed. *See N.J.R.E.* 702 (allowing expert opinion only "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]"). In these circumstances, determining whether defendant was under the influence of marijuana was not "beyond the ken of the average [finder of fact.]" *DeHanes v. Rothman*, 158 *N.J.* 90, 100, 727 *A.2d* 8 (1999) (quoting *State v. Kelly*, 97 *N.J.* 178, 208, 478 *A.2d* 364 (1984)). Thus, we adopt the rationale employed by both the municipal court and the Law Division and hold that additional expert opinion was not necessary in order to sustain defendant's conviction for "operat[ing] a motor vehicle while under the influence of ... [a] narcotic, hallucinogenic or habit-producing drug" in violation of *N.J.S.A.* 39:4–50.[7] *See, e.g., City of Wichita v. Hull,*

---

[7] A defendant, of course, remains free to defend on the basis that the amount of marijuana or other qualifying drug found in his system was insufficient to render him "under the influence." No such defense was tendered in this case.

11 *Kan.App.*2d 441, 447, 724 *P.*2d 699, 703 (Kan.App.1986) (holding that circumstantial evidence "was sufficient to lead any reasonable person to conclude that defendant's taking a sleeping pill resulted in intoxication which impaired his ability to drive."); *Griggs v. State,* 167 *Ga.App.* 581, 584, 307 *S.E.*2d 75, 78 (Ga.App.1983) (holding that aggregate of police officer's observations of defendant's demeanor and physical appearance, coupled with chemical tests indicating that defendant had been using marijuana "was sufficient for a rational trier of fact . . . to reasonably have found that defendant was guilty beyond a reasonable doubt of the offense[ ] of driving under the influence of marijuana. . . .").

## C.

That said, expert testimony remains the preferred method of proof of marijuana intoxication. We arrive at that conclusion in the knowledge that it is not too difficult a burden for the State to offer an expert opinion as to marijuana intoxication. Prosecutors in municipal courts throughout the State routinely qualify local and state police officers to testify as experts on the subject of marijuana intoxication. Expert testimony only requires that a witness be qualified "by knowledge, skill, experience, training, or education." *N.J.R.E.* 702; *see also State v. Moore,* 122 *N.J.* 420, 458–59, 585 *A.*2d 864 (1991) (noting that "an expert must 'be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion' " (alteration in original) (quoting *State v. Odom,* 116 *N.J.* 65, 71, 560 *A.*2d 1198 (1989))). In view of their training, police officers in this State are eligible to qualify as experts on marijuana intoxication under *N.J.R.E.* 702. We note that, before they are commissioned, police officers must "successfully complet[e] the Basic Course for Police Officers" authorized by the Police Training Commission. Div. of Criminal Justice Police Training Comm'n, *Basic Course for Police Officers Trainee Manual* iii (Jan. 1, 2006), *available at* http://www.state.nj.us/lps/dcj/njptc/pdf/trainee_manual/bcpo–trainee–cover–012006.pdf; *see also N.J.S.A.* 52:17B–68; *N.J.A.C.* 13:1–5.1. As part of their required

course of study, police officers must be trained in detecting drug-induced intoxication. *See N.J.A.C.* 13:1-6.1 (authorizing Police Training Commission to establish curriculum for approved and authorized schools); Div. of Criminal Justice Police Training Comm'n, *Basic Course for Police Officers Trainee Manual: Performance Objectives* 3-61 to 3-65 (Jan. 1, 2006), *available at* http://www.state.nj.us/lps/dcj/njptc/pdf/trainee_manual/bcpo_master_2004_final.pdf (detailing curriculum requiring police trainees to know "the common non-technical names, slang names, typical packaging and symptoms of use" of various drugs, including marijuana); *see also* Div. of Criminal Justice Police Training Comm'n, *Agency Training Responsibilities Manual* § 2, at 69-79 (July 1, 2002), *available at* http://www.state.nj.us/lps/dcj/njptc/manuals/bcpo_sleo2.pdf (detailing symptoms for alcohol and specific drug intoxication in describing appropriate handling of impaired prisoners).

## IV.

The judgment of the Appellate Division is reversed, defendant's conviction is reinstated, and the cause is remanded to the Law Division for such additional proceedings as may be required consistent with this opinion.

*For reversal/reinstatement/remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.