66 A.3d 237

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES,[1] PLAINTIFF–RESPONDENT, v. Y.N., DEFENDANT– APPELLANT, AND P.C., DEFENDANT.

IN THE MATTER OF P.A.C., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued April 29, 2013—Decided June 4, 2013.

---

[1] Effective June 29, 2012, the New Jersey Division of Youth and Family Services was renamed the Division of Child Protection and Permanency. *L.* 2012, *c.* 16.

Before Judges GRAVES, ESPINOSA and GUADAGNO.

*Clara S. Licata,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney; *Ms. Licata,* on the brief).

*Lisa Rusciano,* Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Rusciano,* on the brief).

*Lisa M. Black,* Designated Counsel, argued the cause for minor P.A.C. (*Joseph E. Krakora,* Public Defender, Law Guardian, attorney; *Ms. Black,* on the brief).

The opinion of the court was delivered by

GUADAGNO, J.S.C. (temporarily assigned).

Y.N. (Yvonne)[2] appeals from the Family Part's July 1, 2011 order, following a fact-finding hearing, that determined she abused or neglected her infant son, P.A.C. (Paul). Paul suffered severe withdrawal symptoms after birth, caused by Yvonne's use of methadone during the last month of her pregnancy. Yvonne argues that she obtained the methadone from a "legitimate program providing assistance from withdrawal," and such use cannot serve as a basis for an adjudication of abuse or neglect. She also claims that a finding of abuse or neglect, under these circumstances, is contrary to established case law that permits a pregnant woman to be in control of her medical decisions. For the reasons that follow, we reject these arguments and affirm.

Yvonne began to use drugs in 2005, when she experienced depression after the death of her infant daughter. Her use of prescription drugs eventually led to her addiction. When Yvonne could no longer obtain pills, she began to use heroin and cocaine. She entered a drug treatment facility in 2007, and a different program in 2010, but relapsed after discharge on both occasions.

---

[2] We employ pseudonyms to protect the privacy of the minor and for ease of reference.

In September 2010, Yvonne injured her hand. When she went to a hospital for treatment, she learned that she was pregnant. At the time, Yvonne was living with defendant P.C. (Phil), who she identified as the baby's father. When she learned of her pregnancy, Yvonne had been taking opiates for several months and, by her own admission, was addicted.

On January 5, 2011, four months after learning she was pregnant, Yvonne attended an intake appointment at American Habitare and Counseling, Inc. (AHC) to begin a methadone treatment program. Yvonne indicated on a form that she had not used heroin, cocaine or oxycodone during the last eight months, but she tested positive for opiates that day. She then admitted to a nurse at AHC that she had been taking "street oxycodone" every three hours. Before her admission to the program, Yvonne signed an informed consent form that provided in pertinent part:

Besides the possible risks involved with the long-term use of Methadone, I further understand that, like heroin and other opioids, information on its effects on pregnant women and their unborn children is at present inadequate to guarantee that it may not produce significant or serious effects.

It has been explained to me that Methadone is transmitted through the milk to the baby and this may cause physical dependence on Methadone in the child. I understand that for a brief period following birth, the child may show temporary irritability or other ill effects due to my use of Methadone. It is essential for the child's physician to know of my participation in an opioid treatment program so that she/he may provide appropriate medical treatment for the child.

Yvonne began with an initial daily dosage of 40 mg of methadone on January 5, 2011, but this was increased to 80 mg by February 7, 2011. On February 18, 2011, Yvonne gave birth to Paul at Morristown Memorial Hospital (MMH). Paul tested positive for methadone and was diagnosed with neonatal abstinence syndrome (NAS), due to his withdrawal symptoms. Five days after his birth, Paul was moved from the newborn nursery to the neonatal intensive care unit (NICU), where he was given doses of morphine to ease the effects of his withdrawal.

During the early morning hours of February 23, 2011, Phil was at the hospital when he and Yvonne argued about how Phil was holding Paul. When hospital staff intervened, Phil became "verbal-

ly hostile" and threatened to remove Paul from the hospital. Hospital security and the Morristown Police Department were called and Phil was escorted from the hospital and told not to return. Later that day, Yvonne obtained a temporary restraining order (TRO) against Phil. In addition to this incident, Yvonne alleged Phil choked her and threw her down stairs in the past. On March 2, 2011, Yvonne requested that the domestic violence complaint be dismissed and the TRO vacated.

On February 24, 2011, a social worker at MMH notified the New Jersey Division of Youth and Family Services (the Division) about the domestic violence incident between Yvonne and Phil.[3] As a result of this referral, the Division began an investigation.

On March 14, 2011, Phil reported to a Division caseworker that Yvonne had relapsed after he found her on her front porch at 2:30 a.m., high on crack cocaine. Yvonne denied these allegations but failed to submit to a urine screen on March 18, 2011, at her outpatient clinic.

When the Division learned that Paul was due to be released from MMH on April 1, 2011, they placed a hospital hold on the infant that temporarily prevented his discharge. The Division then filed a complaint and order to show cause seeking custody, care, and supervision of Paul. The Family Part judge determined that the Division had not established that Yvonne presented a risk of harm to Paul, and released Paul to her custody pending a negative drug screening. The Division retained care and supervision of Paul.

On June 29, 2011, a fact-finding hearing was held as to Yvonne only. A Division supervisor presented an overview of the case and introduced the Division's case file, which included Paul's extensive

---

[3] It does not appear that anyone from MMH notified the Division that Yvonne gave birth to a child suffering withdrawal symptoms. We take this opportunity to note that *N.J.S.A.* 9:6–8.10 requires "[a]ny person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or otherwise."

medical records. A Division caseworker then testified that she investigated Yvonne's initial allegations of domestic violence as well as her failure to submit to a drug screen on March 18, 2011.

Yvonne testified that she was taking Percocet when she learned she was pregnant and someone told her that she should not stop taking the drug because she "could stand to lose the fetus if [she] stopped due to ... possible withdrawal." Yvonne recanted all of the allegations of domestic violence she made against Phil when she obtained the TRO and claimed she was pressured to apply for the TRO by the police and hospital staff. She also admitted that she lied about the prior acts of domestic violence because she feared she would lose custody of Paul.

At the conclusion of the hearing, the court found that the Division proved by a preponderance of the evidence that Yvonne abused or neglected Paul.

On appeal, Yvonne provides the following arguments for our consideration:

POINT I

THE COURT BELOW DID NOT FOLLOW THE APPROPRIATE LEGAL STANDARD IN DETERMINING THAT [YVONNE] ABUSED AND NE-GLECTED [PAUL].

POINT II

THE DIVISION FAILED TO PROVE THAT [YVONNE'S] PRE–PREGNANCY HISTORY OF DRUG USE OR HER PRE–NATAL INGESTION OF PERCO-CET, OXYCONTIN [4] OR METHADONE EITHER HARMED [PAUL] OR EX-POSED HIM TO A RISK OF FUTURE HARM.

A. [YVONNE'S] PAST HISTORY OF DRUG DEPENDENCY ON COCAINE AND HEROIN PRIOR TO THIS PREGNANCY.

B. USE OF PERCOCET AND OXYCONTIN DURING THE PREGNANCY UNTIL JANUARY, 2011.

C. RISK OF HARM TO [PAUL] BASED ON THE POSSIBILITY OF [YVONNE] USING ILLICIT DRUGS IN THE FUTURE.

---

[4] In her statements to AHC staff and during her testimony at the fact-finding hearing, Yvonne admitted to using oxycodone. In her brief, defendant refers to the drug as OxyContin. Oxycodone is a synthetic drug derived from opium. *United States v. Ilayayev*, 800 *F.Supp.*2d 417, 429 (E.D.N.Y.2011). OxyContin is a controlled-release encapsulation of oxycodone. *Id.* at 430.

POINT III

THE DIVISION FAILED TO PROVE ANY IMMINENT, SUBSTANTIAL FUTURE RISK OF HARM TO [PAUL] BASED ON THE ALLEGED DOMESTIC VIOLENCE HISTORY BETWEEN [YVONNE] AND [PHIL].

The Law Guardian argues that the trial court properly determined that Yvonne abused or neglected Paul and, because there was proof of actual harm, there was no reason for the trial court to engage in an analysis of risk of harm.

The trial court found that Yvonne learned she was pregnant "at least in September [2010]" and continued to use illicit drugs until January 2011, when she entered a methadone program. The judge noted that Yvonne admitted that she was aware that continuing to use illicit drugs during her pregnancy was "high risk," but found that Yvonne "[c]ontinued to take illicit drugs, prescribed and unprescribed, knowing that she was pregnant for that period of time...." The judge found Yvonne had "a long history of drugs, and that she continued to expose the child to [drugs]," and noted, "[w]hen a child is born drug exposed to illicit drugs, we routinely say that's abuse and neglect." The judge also found Yvonne's "credibility very questionable ... [and] had difficulty believing a lot of the things she said."

Our review of the factual findings of a trial judge sitting without a jury is limited, and we determine whether those findings are supported by adequate, substantial, credible evidence in the record. *Cesare v. Cesare,* 154 *N.J.* 394, 411–12, 713 *A.*2d 390 (1998); *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

The record contains abundant and compelling evidence of the harm Paul suffered during his period of withdrawal. On February 19, 2011, Paul's drug screen was positive for methadone and he was diagnosed with NAS. While Paul was initially placed in the hospital's well-baby nursery, he had to be transferred to the NICU on February 23, 2011 because of his withdrawal reaction. Paul was given oral doses of morphine every three hours to ease his withdrawal. Then, he had to be gradually weaned from the

morphine. Paul's discharge summary indicates that it took thirty-nine days until the morphine could be discontinued.

Yvonne does not dispute that Paul suffered harm during this withdrawal period. She contends, however, that a finding of abuse or neglect cannot be based upon her ingestion of methadone from "a legitimate program providing assistance from withdrawal." We disagree.

The fact that defendant obtained the methadone from a legal source does not preclude our consideration of the harm it caused to the newborn. An inquiry under *N.J.S.A.* 9:6–8.21 must focus on the harm to the child, rather than on the intent of the caregiver. *G.S. v. Dep't of Human Servs.*, 157 *N.J.* 161, 180–81, 723 *A.*2d 612 (1999). Harm to the child need not be intentional in order to substantiate a finding of abuse or neglect. *N.J. Div. of Youth & Family Servs. v. M.C. III*, 201 *N.J.* 328, 344, 990 *A.*2d 1097 (2010); *see also G.S., supra*, 157 *N.J.* at 176, 723 *A.*2d 612 ("[U]nder Title 9, whether the guardian intended to harm the child is irrelevant.")

"Methadone is a synthetic narcotic and a central nervous system depressant." *Beazer v. N.Y. City Transit Auth.*, 399 *F.Supp.* 1032, 1038 (S.D.N.Y.1975), *modified*, 558 *F.*2d 97 (2d Cir.1977), *rev'd on other grounds*, 440 *U.S.* 568, 99 *S.Ct.* 1355, 59 *L.Ed.*2d 587 (1979). The District Court in *Beazer* explained the uses of methadone:

Methadone has been used, under medical controls, as a pain killer. Also, methadone is used in "detoxification units" . . . to take addicts off of heroin. This is done by switching a heroin addict to methadone and gradually reducing the doses of methadone to zero over a period of about three weeks. The patient thus detoxified is drug free. Moreover, it is hoped that the program of gradually reduced doses of methadone leaves him without the withdrawal symptoms, or the "physical dependence" on a narcotic.

[*Ibid.*]

An argument similar to defendant's was presented in *State v. Tamburro*, 68 *N.J.* 414, 346 *A.*2d 401 (1975), which involved a defendant who was convicted of operating a motor vehicle while under the influence of a narcotic. The defendant admitted to

having ingested methadone on the morning of his arrest, but claimed that the evidence was insufficient, as he was enrolled in a methadone maintenance program and his conviction "adversely affects all methadone programs by subjecting participants therein to charges of violating *N.J.S.A.* 39:4–50." *Id.* at 416–17, 346 *A.*2d 401.

Our Supreme Court found no merit or validity to this argument and affirmed the defendant's conviction, concluding, "[d]efendant was found guilty because the evidence showed he was under the influence of a narcotic to an extent that it materially affected his physical and mental faculties and made it unsafe for him to operate a motor vehicle on the highway." *Id.* at 421, 346 *A.*2d 401. The Court held that the fact that the drug in question was methadone was immaterial as

> [t]he statute does not require that the particular narcotic be identified. It is enough if, from the subject's conduct, physical and mental condition and the symptoms displayed, a qualified expert can determine that he or she is "under the influence" of a narcotic. This, of course, would include a drug which produces a narcotic effect.
>
> [*Ibid.*]

■ In *New Jersey Department of Children & Families v. A.L.*, 213 *N.J.* 1, 22, 59 *A.*3d 576 (2013), the Court stated

> the primary question under Title 9 is whether [the child], as a newborn, "ha[d] been impaired" or was in "imminent danger of becoming impaired" as a result of his mother's failure to exercise a minimum degree of care by unreasonably inflicting harm or allowing a "substantial risk" of harm to be inflicted.... [E]vidence of actual impairment to the child will satisfy the statute....

Paul's severe withdrawal, which required treatment in the NICU and numerous doses of morphine over an extended period of time, is compelling evidence of actual impairment. *See also In re Guardianship of K.H.O.*, 161 *N.J.* 337, 349, 736 *A.*2d 1246 (1999) ("a child born addicted to drugs and suffering from the symptoms of drug withdrawal as a result of her mother's substance abuse during pregnancy has been harmed by her mother and that harm endangers the child's health and development"). Where there is evidence of actual impairment, it is immaterial whether the drugs taken were from a legal or illicit source.

Defendant next argues that she should be in control of her medical decision to ingest methadone and that a finding of abuse or neglect under these circumstances, "would run counter to established case law permitting a pregnant woman to be in control of medical decisions, even if such decisions have an adverse effect on the unborn child." We disagree.

Defendant cites *New Jersey Division of Youth & Family Services v. S.N.W.*, 428 *N.J.Super.* 247, 52 *A.*3d 200 (App.Div.2012), in support of her argument. In *S.N.W.*, we vacated a finding that a mother had abused or neglected her twenty-month old and five-month old children. The finding had been based solely on a determination that the mother appeared to be under the influence of Xanax while the children were in her care. We held that the mere fact that a parent appeared inebriated is not necessarily determinative of whether that parent was providing a minimum degree of care. We remanded to determine if the defendant ingested more than the prescribed dosage of Xanax, and if she did, whether she was able to exercise a minimum degree of care in that condition.

The facts of this case are considerably different. In *S.N.W.*, there was no proof that the mother's ingestion of Xanax actually harmed the children. By contrast, Yvonne's use of methadone was the direct cause of Paul's severe withdrawal symptoms, a recognized harm under *A.L.* and *K.H.O.*

Defendant also relies on the concurring opinion in *New Jersey Division of Youth & Family Services v. V.M.*, 408 *N.J.Super.* 222, 974 *A.*2d 448 (App.Div.) *certif. denied,* 201 *N.J.* 272, 989 *A.*2d 1264 (2009), *cert. denied,* —— *U.S.* ——, 130 *S.Ct.* 3502, 177 *L.Ed.*2d 1095 (2010). In *V.M.*, the parents of a newborn, appealed the finding that they abused and neglected their child. After the mother was admitted to a hospital for the delivery of her child, she refused to consent to certain invasive treatment, including a Cesarean section. *Id.* at 227, 974 *A.*2d 448. Hospital records described the mother's behavior as "combative," "uncooperative," "erratic," "noncompliant," "irrational" and "inappropriate." *Ibid.*

Hospital staff determined that the mother had a psychiatric history and had been diagnosed with post-traumatic stress disorder and suffered from either a schizoaffective disorder or a bipolar disorder. *Id.* at 228–29, 974 *A.*2d 448.

The trial judge found that the mother's behavior was "alarming" and "might have caused a reasonable person to believe the child was in danger." *Id.* at 231, 974 *A.*2d 448. In determining that the child was abused or neglected, the judge considered the mother's refusal to consent to a C-section, although he did not base his findings solely on that refusal. The concurring opinion, relied upon here by defendant, held that "[c]onsideration of [a mother's] refusal to submit to a C-section . . . is improper and beyond the legislative scope of the child-protective statutes." *Id.* at 226. However, the majority in *V.M.*, concluded that, while the trial judge considered the mother's refusal to consent to the C-section, "there was substantial additional evidence of abuse and neglect that supported the ultimate findings." *Id.* at 224, 974 *A.*2d 448. Neither the majority nor the concurring opinions in *V.M.* provide support to defendant's claim that a pregnant woman's decision to ingest methadone cannot support a finding of abuse or neglect when the child suffers harm as a result.

As defendant admits that her use of methadone caused Paul's withdrawal symptoms, we need not consider her claim that the Division failed to prove that her prenatal use of Percocet and OxyContin caused harm to Paul or exposed him to a risk of harm.

Affirmed.