STATE OF NEW JERSEY, APPELLANT, v.
PAUL DiCARLO, RESPONDENT.

Argued November 18, 1974—Decided May 13, 1975.

322

*Mr. Julian Wilsey,* Deputy Attorney General, argued the cause for appellant (*Mr. William F. Hyland,* Attorney General, attorney; *Mr. Wilsey,* of counsel and on the brief).

*Mr. Carl D. Poplar* argued the cause for respondent.

The opinion of the Court was delivered by

MOUNTAIN, J. Defendant was convicted in the Gloucester Township Municipal Court of having violated *N. J. S. A.* 39:4–50(a). This statute provides for the imposition of a fine or prison sentence, as well as temporary forfeiture of driving privileges, in the event a person is found to have been operating a motor vehicle ". . . while under the influence of intoxicating liquor, [or a] narcotic, hallucinogenic or habit-producing drug. . . ." The judgment of conviction was appealed to the Camden County Court where defendant was again found guilty following a trial *de novo* on the record. The sentence imposed in each court was the same: a fine of $200 plus court costs of $15 and a two-year suspension of driving privileges.

The Appellate Division, in an unreported opinion, reversed defendant's conviction and we thereafter granted the State's petition for certification. 65 *N. J.* 572 (1974).

At the trial before the Municipal Court judge the arresting officer testified that he initially observed defendant traveling at a high rate of speed. He also noticed that the vehicle kept crossing the center line of the highway and that it veered to the wrong side of the road in negotiating a turn. Approaching a stop light, the car was driven midway through the intersection before being brought to a halt. At that point the officer observed defendant open the car door; it appeared he was about to fall out. Upon observing the officer, defendant succeeded in closing the door. After the vehicle had proceeded through the intersection, the officer flashed his red light and brought the car to a stop. As defendant left his automobile and approached the police vehicle, he was "staggering about" and "swaying a little bit." Upon being questioned, he denied having been drinking, but agreed to perform several balancing tests, all of which he failed. Defendant was consistently polite and gave the officer no trouble. At the police station he again failed all but one of the balancing tests. Blood and urine samples were obtained. Laboratory analysis revealed the presence, in the urine sample, of a drug known as methaqualone.

The Appellate Division reversed the conviction upon two grounds. It held first that the meaning of the term, "narcotic drug," as set forth in the Controlled Dangerous Substances Act, *N. J. S. A.* 24:21-2, provides the definition that should be applied to the same term as it appears in *N. J. S. A.* 39:4-50(a), the statute under which defendant was convicted. It found that methaqualone did not come within that definition. Secondly, the Court concluded that even were the statutory definition held to be inapplicable, the evidence at the trial had been insufficient to justify a finding that methaqualone was in fact a "narcotic drug."

As to the first issue, in order to support the view of the Appellate Division that the definition of "narcotic drug" found in the Controlled Dangerous Substances Act should be given controlling weight in interpreting the same phrase appearing in the statute under which defendant was convicted, it must be found that the two enactments are *in pari materia*. It is true that each may be said to pertain, in a way, to the same subject matter — narcotic drugs. But there the similarity ends. The statutes clearly do not have the same purpose or object, and it is identity or similarity of purpose or object that most convincingly justifies resort to the rule of *in pari materia* as an aid in statutory construction. The adventitious occurrence of like or similar phrases, or even of similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule.

As between characterization of the subject matter with which a statute deals and characterization of its object or purpose, the latter appears to be the more important factor in determining whether different statutes are closely enough related to justify interpreting one in the light of the other. For example, it has been held that where the same subject is treated in several acts having different objects the rule of in pari materia does not apply. [2A *Sutherland, Statutory Construction*, § 51.03, p. 298 (4th ed. 1973)]

It seems clear that the purposes of the two statutes are quite different. *N. J. S. A.* 39:4–50 seeks to prevent the operation of motor vehicles by those whose faculties are so impaired as to present a danger to the safety of others as well as themselves. *State v. Sturn*, 119 *N. J. Super.* 80, 82 (App. Div. 1972), certif. den., 61 *N. J.* 157 (1972). On the other hand the Controlled Dangerous Substances Act, *N. J. S. A.* 24:21–1 *et seq.*, as well as earlier and similar legislation which it superseded, has had as its object the suppression of illegal traffic in narcotic drugs. *State v. Reed*, 34 *N. J.* 554, 564 (1961) ; *State v. Weissman*, 73 *N. J. Super.* 274, 282 (App. Div. 1962), certif. den. 37 *N. J.* 521 (1962) (both referring to the Uniform Narcotic

Drug Act, the predecessor of the Controlled Dangerous Substances Act). Thus, in enacting *N. J. S. A.* 39:4-50, the legislative concern was not with the specific type of drug used, but rather with the effect that its ingestion by a driver would have upon his own safety as well as that of the general public. Given this broader purpose, we feel no compulsion to restrict the application of this statute by finding it to be *in pari materia* with the Controlled Dangerous Substances Act.

An examination of motor vehicle legislation in the 1964-65 session of the Legislature furnishes additional support for this conclusion. *L.* 1964, *c.* 289,[1] entitled "An Act concerning motor vehicles and traffic regulation," forbids the operation of a motor vehicle by any person "while knowingly having in his possession or in the motor vehicle any narcotic drug within the meaning of section 24:18-2 of the Revised Statutes. . . ." The subject matter of this last cited statute, part of the Uniform Narcotic Drug Law, was the same as *N. J. S. A.* 24:21-2, the superseding provision in our present Controlled Dangerous Substances Act. At the same session of the Legislature the statute under which defendant was here convicted, *N. J. S. A.* 39:4-50, was amended. *L.* 1964, *c.* 137. This amendatory act, like *L.* 1964, *c.* 289 cited above, was also entitled, "An Act concerning motor vehicles and traffic regulation." As was true of the statute it amended, this enactment made no reference to the Drug Act. The passage at the same legislative session of these two statutes, both concerning motor vehicles and traffic regulation, each touching upon the subject of narcotic drugs, one specifically defining the term by reference to the Drug Act and the other failing to do so, at the very least suggests strongly that the two statutes, *N. J. S. A.* 39:4-50 and 24:21-2 are not intended to be read together. The absence of any specific reference to the Drug

[1]Now *N. J. S. A.* 39:4-49.1.

Act in one statute can hardly be deemed an inadvertent omission in view of the explicit reference to that enactment in the other statute, especially when it is borne in mind that both acts deal with the same general subject matter and both were adopted at very nearly the same time.

██ ██ The alternative basis upon which the Appellate Division relied in reversing defendant's conviction was its conclusion that there was insufficient evidence in the record to establish that methaqualone is a "narcotic, hallucinogenic or habit-producing drug." It is well settled that a prosecution under *N. J. S. A.* 39:4–50 is a quasi-criminal proceeding that requires the State to establish guilt beyond a reasonable doubt. *State v. Emery,* 27 *N. J.* 348, 353 (1958). Bearing this fully in mind, we nevertheless disagree with the Appellate Division and are of the opinion that the testimony presented at the trial was more than sufficient to establish beyond a reasonable doubt that methaqualone is a "narcotic drug" within the plain or generic meaning of that term. The word "narcotic," has been variously defined as:

1: a drug * * *that in moderate doses allays sensibility, relieves pain and produces profound sleep but that in poisonous doses produces stupor, coma or convulsions.
2: something that soothes, relieves or lulls. [*Webster's Third International Dictionary* (Unabridged) 1503 (1971)]
An agent that produces insensibility or stupor. [*Dorland's Medical Dictionary* 982 (1965)]
A medical substance or drug which when taken in sufficiently large doses, produces profound stupor or complete insensibility. In smaller doses, it relieves pain without causing stupor. It also induces sleep. [2 *Schmidt's Attorney's Dictionary of Medicine* N–2 (1974).]

At the Municipal Court hearing, the prosecution offered the testimony of a chemist for the State Police who had analyzed the blood and urine samples taken from the defendant. After being qualified as an expert witness, the chemist testified that the blood tests for alcohol and barbiturates were negative. Test results from the urine sample, however, revealed the presence of methaqualone, which the chemist

characterized as "a sedative [with] similar properties like barbiturates," although he twice stated that it was not a barbiturate. He further testified as to the effect of methaqualone as follows:

It [methaqualone] impairs the judgment; it will impair the motor co-ordination. And even seven, eight hours after taking the drug, the person may not be sleepy but all the symptoms will be there.

At still another point, the chemist described the drug as being a depressant to a person's motor system, certain aspects of which are employed in driving an automobile. Finally, he related that 0.15 milligrams of methaqualone were found in the defendant's urine, an amount which he described as "a good dosage."

We are satisfied that the foregoing evidence, when taken in conjunction with the testimony of the arresting officer, which clearly revealed defendant's physical disabilities at the time the arrest took place, was more than adequate to establish beyond a reasonable doubt that the drug can be considered a "narcotic" under the plain or generic meaning of that term. It is similarly sufficient to make clear, contrary to defendant's contention, that he was under its influence. We cannot agree with the defendant that it was fatal to the State's case that there was no express statement by the expert witness that in his opinion methaqualone is a narcotic drug. Certainly a question directed to this point would have been appropriate. But the posing of such a question and the receipt of an affirmative answer were not essential to a conviction. As we have said, the testimony elicited sufficed to establish that methaqualone may produce a narcotic effect on a person so altering his or her normal physical coordination and mental faculties as to render such person a danger to himself as well as to other persons on the highway.[2]

---

[2]Since the date of the offense on April 2, 1973, both the Federal government and the State of New Jersey have specifically recognized

■ Defendant's final contention is that the testimony concerning the urine sample should have been stricken as the State had failed to establish an adequate chain of possession from the time the sample left the arresting officer's hands until its analysis by the chemist who testified at the municipal hearing. While we agree that the testimony upon this point was not meticulously complete, the sufficiency of the "chain" is within the discretion of the trial judge, and his ruling will not be disturbed unless it can be shown that he clearly erred in its exercise. *State v. Brown*, 99 *N. J. Super.* 22, 27 (App. Div. 1968), certif. denied 51 *N. J.* 468 (1968). We have reviewed the record and find no such error here.

For the foregoing reasons the decision of the Appellate Division is reversed and the judgment of conviction is reinstated.

PASHMAN, J., concurring. I concur in the result reached by the majority and with its analysis of the relationship between the operating-under-the-influence statute, *N. J. S. A.* 39:4–50(a) and the Controlled Dangerous Substances Act, *N. J. S. A.* 24:21–1 *et seq.* From that point, however, I would reach the conclusion that methaqualone is within the coverage of *N. J. S. A.* 39:4–50(a) by a somewhat different route.

Defendant was charged with operating a motor vehicle while under the influence of a "narcotic, hallucinogenic or habit-producing drug" in violation of *N. J. S. A.* 39:4–50(a). He was arrested after driving erratically and at a high speed through a residential neighborhood. When, at the request of the arresting officer, defendant left his car,

the harmful effects of methaqualone, including the possibility of psychological and physical dependence when the use of the drug is abused. It has been included by the federal government in Schedule II of the Controlled Substances Act, 21 *U. S. C. A.* § 801 *et seq.* See 21 *C. F. R.* § 812. Likewise it has been added to Schedule II of our own Controlled Dangerous Substances Act. *N. J. A. C.* 8:65–10.1.

he walked only with difficulty, swaying and staggering, and was unable to perform simple balance tests. This, considered with subsequent analysis of a urine sample taken at the time of arrest and revealing a drug generically known as methaqualone in defendant's system, would support a conclusion that defendant was under the influence of that drug.

At trial, the State's expert witness described methaqualone as a sedative with properties similar to the barbiturates. He indicated that it functions as a central nervous system depressant which may impair judgment and motor coordination for a period of up to eight hours.

The majority holds that this evidence establishes that defendant was under the influence of a "narcotic drug," as the term is used in *N. J. S. A.* 39:4-50(a). It offers several variant definitions for "narcotic" but all identify the central characteristic of a narcotic drug as its power to induce a stupor in the user. I am not satisfied that the present record establishes that methaqualone is a "narcotic drug" within any of the alternative definitions proffered by the majority.[1]

Criminal statutes are, of course, to be interpreted in light of the "mischief and evil sought to be suppressed," so as to give effect to the legislative purpose. *State v. Meinken,* 10 *N. J.* 348, 352 (1952). The purpose behind *N. J. S. A.* 39:4-50(a), properly noted by the majority, is "to prevent the operation of motor vehicles by those whose faculties are so impaired as to present a danger to the safety of others as well as themselves." *Ante* at 325. While *N. J. S. A.* 39:4-50(a) specifically refers to "narcotic, hallucinogenic or habit-producing drugs," the Legislature appears not to have

---

[1]According to information published by manufacturers of methaqualone, the drug is technically a hypnotic agent rather than a narcotic. In clinical doses it induces drowsiness. *1974 Physicians Desk Reference* 1253 (1974). At the time of the trial below, methaqualone was thought to be non-addictive. *Id.* More recent reports indicate that it is addictive if taken in large doses without medical supervision. *Id.* at A-24 (Supp. A 1974).

been concerned with the precise pharmacological definitions of these terms but rather with the fact that they represent classes of drugs known to impair the ability of the user to drive safely. I would therefore construe this statutory language to refer to any drug which powerfully affects the central nervous system so as to produce significant impairment of perception, judgment, or muscular coordination. This is merely an application of the familiar principle of statutory construction that "particular words may be enlarged or restricted in meaning by their associates and the evident spirit of the whole expression." *Salz v. State House Commission*, 18 *N. J.* 106, 111 (1955); *In re Marvin*, 97 *N. J. Super.* 62, 72 (App. Div. 1967) aff'd 53 *N. J.* 147 (1969) *cert.* den. 396 *U. S.* 821, 90 S. Ct. 62, 24 L. Ed. 2d 72 (1969).

Such an interpretation does not offend either the principle of strict construction of penal statutes, *State v. Provenzano*, 34 *N. J.* 318, 322 (1961); *State v. Meinken*, 10 *N. J.* 348 (1952); *State v. Angelo's Motor Sales*, 125 *N. J. Super.* 200, 207–8 (App. Div. 1973) aff'd *sub nom. State v. Parmigiani*, 65 *N. J.* 154 (1974); *State v. Gattling*, 95 *N. J. Super.* 103, 108 (App. Div. 1967) certif. den. 50 *N. J.* 91 (1967), or the principle of *expressio unius est exclusio alterius*, *Reilly v. Ozzard*, 33 *N. J.* 529, 539 (1960). Both of these rules of statutory construction are subordinate to the higher principle that insofar as possible, statutes should be construed by the courts so as to realize rather than defeat the legislative purpose. *Cf. United States v. Walton*, 514 *F.* 2d 201 (D. C. Cir. 1975) (federal statute prohibiting distribution of derivatives of Cannabis sativa L. construed to include all products containing the active ingredient found in marijuana, whether derived from that species or some other).

So construed, *N. J. S. A.* 39:4–50(a) plainly covers methaqualone, and it is on that basis that I would reverse.

PASHMAN, J., concurring in the result.

*For reversal*—Chief Justice HUGHES and Justices MOUN-TAIN, SULLIVAN, PASHMAN and CLIFFORD—5.

*For affirmance*—None.