**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2044-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

COREY J. BARBER,

     Respondent-Appellant.

_____

> Argued February 12, 2024 – Decided February 28, 2024
>
> Before Judges Mawla, Marczyk, and Chase.
>
> On appeal from the Superior Court of New Jersey, Law Division, Morris County, Municipal Appeal No. 18-021.
>
> Damiano Marcello Fracasso argued the cause for appellant.
>
> Tiffany M. Russo, Assistant Prosecutor, argued the cause for respondent (Robert J. Carroll, Morris County Prosecutor, attorney; Tiffany M. Russo, of counsel and on the brief).

PER CURIAM

Defendant Corey J. Barber appeals from his conviction for driving under the influence (DUI) of a drug, N.J.S.A. 39:4-50(a). We reverse and vacate the conviction for the reasons expressed herein.

The following facts were adduced during a pre-trial motion to suppress and defendant's municipal court trial. The State's witnesses were Morris County Park Police Officers Joseph Abrusci and Anthony Brunone, and a New Jersey State Police forensic scientist. Defendant testified on his own behalf.

At approximately 1:26 p.m. on September 16, 2016, Officers Abrusci and Brunone were in a patrol vehicle in the median of Route 80 monitoring westbound traffic. The posted speed limit was sixty-five miles per hour. Officer Abrusci was operating the speed radar and attempted to aim it at defendant's vehicle but there were cars in the way. However, the vehicles he did scan were traveling over seventy to seventy-five miles per hour, and defendant's vehicle was traveling faster than those cars. Officer Abrusci conservatively estimated defendant's vehicle was "traveling approximately [seventy-five] to [eighty] miles an hour." The officers pursued defendant to stop him for speeding.

While following defendant, Officer Abrusci observed him make "an abrupt lane change, from the fast lane to the middle lane" without using any turn signal. There were vehicles in the middle lane, and defendant moved in between

them.  Defendant's maneuver caused the vehicle behind him to slow down to let him into the middle lane.  Officer Brunone offered similar testimony about the pursuit.

After the officers pulled defendant over, Officer Brunone approached the driver's side of defendant's vehicle and Officer Abrusci approached on the passenger side.  Officer Abrusci observed defendant had "red, watery eyes" and "droopy eyelids."  His voice was "hoarse, raspy," and he "appeared nervous, shaky."

Officer Abrusci observed "a couple of bottles of air fresheners" in the car, and smelled "a faint odor" of raw cannabis that was "partially masked by the air fresheners."  In Officer Abrusci's experience, air fresheners were used to "mask the odors from inside a vehicle," in particular, "[o]dors of marijuana."  He could also "see some greenish brown vegetation that was in the matting of the . . . floor, on the other side of the car" and went around to the driver's side of the vehicle "to get a better look at it."  He believed the vegetation was small pieces of cannabis, known as "shake."  However, he did not collect a sample of the vegetation because it was too small to send to a laboratory for testing.[1]

---

[1]  Officer Brunone's report did not mention defendant having watery or bloodshot eyes, the smell of air fresheners, seeing "burnt marijuana," or observing "shake" on the floor.

3

Officer Abrusci motioned to Officer Brunone to have defendant exit his vehicle. However, Officer Brunone testified he did not see Officer Abrusci attempting to get his attention. Instead, Officer Brunone asked defendant to get out of the car because it was safer to talk to him outside of the car, though he admitted he did not think defendant was a threat to him.

Defendant told Officer Brunone that he had had knee surgery about three months prior. After defendant got out of the car, Officer Abrusci went back and forth from the passenger side to the driver's side of the car several times. He testified the odor of cannabis was stronger on the driver's side. Officer Abrusci confirmed his observation defendant "had very distinct reddening" of the eyes, as well as droopy eyelids, and "glassy, or watery" eyes. He asked defendant to close his eyes, and he observed "very noticeable eyelid tremors."

Both officers noted defendant's pupils were constricted. However, they acknowledged this could have been a normal reaction to the sun.

Each officer asked defendant a variety of background questions, which defendant had no difficulty understanding. However, Officer Abrusci suspected defendant was under the influence of "cannabis and [there] may have been other substances involved" because his "mannerisms" were consistent with being under the influence of cannabis and narcotics.

4

After a third officer arrived on the scene, Officer Abrusci searched the vehicle. He located two prescription pill-type bottles on the back seat underneath clothes and other items, within reach of the driver, and found some cannabis and a pipe with the burnt residue of cannabis. Officer Abrusci could smell the odor of cannabis emanating from both containers, and could tell by the semi-transparent nature of the containers that they did not contain pills "or something that would normally be in a prescription bottle."

The officers permitted defendant to use his cell phone to make a call. Defendant called his brother-in-law, who was a police officer in New York. He also texted his attorney, who responded that defendant should assert his right to counsel and to remain silent.

Officer Brunone placed defendant under arrest for possession of marijuana and paraphernalia and read him his Miranda[2] rights. The officers transported defendant to the Morris County Park Police headquarters. On the way to headquarters, defendant's cell phone was in the front seat with the officers and rang continually. Defendant told the officers it was either his father or his attorney calling. Officer Abrusci testified defendant was not given his

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2044-19

phone because he "was not entitled to make a phone call, because of the breath test prerequisites."

The trio arrived at the police station at approximately 2:20 p.m. Both officers conducted a pre-breath-test observation period by observing defendant for thirty minutes. However, the Alcotest machine was not working, and the officers realized they would need to transport defendant to another police station to obtain a valid breath test.

Instead, Officer Abrusci decided to proceed with a drug recognition expert (DRE) evaluation because he was concerned about "potentially losing evidence of [defendant's] drug impairment" due to the time needed to obtain a valid breath test at another facility. Officer Abrusci testified defendant's breath did not smell of alcohol and he had no reason to believe defendant had been drinking.

Before Officer Abrusci proceeded with the DRE evaluation, Officer Brunone again read defendant his Miranda rights and had him sign a notification of rights form. Notably, defendant initialed that he had been read and understood each right, but he checked "no" in response to the final entry: "HAVING THESE RIGHTS IN MIND, I WISH TO TALK TO YOU." Officer Brunone could not recall if the second Miranda warning took place before or after the aborted breath test, but he knew it was before the other steps of the

A-2044-19

DRE evaluation began. Officer Abrusci testified both he and Officer Brunone read defendant his <u>Miranda</u> rights before the DRE evaluation began.

Defendant testified the officers never returned his phone before the DRE evaluation, and instead returned it to him "at the very end, after they gave [him] all the tickets." Officer Abrusci testified that, when he read defendant his <u>Miranda</u> rights, defendant asked if he could call his attorney. The officer told him he could and offered defendant his phone, but defendant declined to take the phone and said he would answer the officer's "stupid questions," adding that they both knew he was there because Officer Abrusci "illegally searched his car and found a gram of pot." Officer Abrusci testified defendant "admitted at that point he had smoked pot a couple of hours ago." Officer Brunone testified he did not know if defendant refused to take the cell phone, only that Officer Abrusci asked defendant if he wanted to call his attorney and defendant "said I'll answer your questions, and that was that."

Officer Abrusci testified that "even though [defendant] didn't directly invoke his right to remain silent," he decided based on defendant's comments not to ask all the "standard questions" usually part of the DRE evaluation. Moreover, he did not ask "certain incriminating questions" because defendant

7

"did ask about calling an attorney" and the officer "didn't want to violate [defendant's] rights . . . to give [him an] opportunity to consult with an attorney."

Officer Abrusci testified he has been certified as a DRE in New Jersey for more than two decades and has been qualified as a DRE in "at least [twenty] different courts." He has also instructed other officers in the required DRE training on how to administer the standardized field sobriety tests. He served as a member at large to the "IACP Technical Advisory Panel."[3] At the time of

---

[3] As recently explained by our Supreme Court, the International Association of Chiefs of Police (IACP) participated in the "development and national expansion" of the DRE protocol, undertook responsibility for the credentialing of DREs nationwide, and

> [i]n 1988, again at the NHTSA's request, the IACP established the Technical Advisory Panel (TAP), which develops criteria for training and certifying DREs, and continually improves the DRE protocol. . . . The TAP typically consists of a physician, a behavioral optometrist, and a toxicologist, as well as DREs and educational institutions.
>
>    . . . .
>
> As of December 2022, the IACP has certified over 400 DREs in New Jersey, the second most of any state in the nation. Presently, there are over sixty certified DRE instructors in this State who train officers in the protocol.
>
> [State v. Olenowski, 255 N.J. 529, 561 (2023) (citation and footnote omitted) (Olenowski II).]

defendant's arrest, Officer Abrusci had thirty-seven years of experience in law enforcement.

Officer Abrusci testified to other vocational experiences, namely, that he has been "in the company of individuals under the influence of marijuana" more than a thousand times. He was involved in arrests "wherein marijuana was found either on a person, in a vehicle or in a home" over a thousand times and was familiar with the smell of raw and burnt cannabis, and "signs that an individual may display" after smoking cannabis.

Officer Abrusci testified when he asked defendant to submit to a DRE evaluation after the failed Alcotest, he explained to him that it was because his observations of defendant gave him "reason to suspect that there may be drugs involved." The officer told defendant he would "be checking his pulse, . . . pupils, . . . blood pressure . . . , running him through a standard series of . . . steps . . . as part of the evaluation process."

Officer Abrusci also told defendant that there were "preliminary questions" that he "would normally ask" during the evaluation. However,

> since it wasn't clear . . . whether or not he was invoking his right to remain silent or just . . . his . . . consultation with an attorney, . . . when I had asked him in reference to . . . the questions, [his answer] was ["]I [will] answer your stupid questions.["] . . . I told him I'm not going to ask you those questions at this point . . . .

9

A DRE's evaluation protocol, known as the Drug Recognition and Classification Program is a twelve-step process,[4] including the Alcotest as step one, and a urine or other toxicological sample as step twelve. Defendant refused to provide a urine sample. Therefore, Officer Abrusci testified he "proceeded . . . with the evaluation," and defendant cooperated.

Because Officer Abrusci was one of the arresting officers, he did not need to interview the arresting officer, as required by step two. Further, he "believed [defendant] may have invoked his rights," so he did not ask him "about usage" of cannabis or other drugs. However, he did "go through some background questions with him, as far as medical conditions, those types of things, and some

---

[4] The Court explained,

> [t]he twelve steps in the DRE protocol consist of (1) a breath alcohol test; (2) an interview of the arresting officer; (3) a preliminary examination and first pulse check; (4) a series of eye examinations; (5) four divided attention tests; (6) a second examination and vital signs check; (7) a dark room examination of pupil size and ingestion sites; (8) an assessment of muscle tone; (9) a check for injection sites and a third pulse reading; (10) an interrogation of the driver and documentation of statements made by the driver as well as any other observations; (11) a final opinion based on the totality of the examination; and (12) a toxicological analysis.
>
> [Id. at 553 (footnote omitted).]

background," in order "to get some clarification and make sure that there were no underlying medical conditions."  He asked defendant "about injuries [and] other medical conditions that could potentially give [the officer] some [e]ffect during the course of the evaluation," and defendant reported none.

Officer Abrusci checked defendant's eyes and found "equal tracking" and a "lack of convergence," which he noted were "consistent and expected with somebody under the influence of cannabis."  He noted "there was no indication of H.G.N.[5], . . . no lack of smooth pursuit, . . . no distinct sustained jerking at maximum deviation and . . . no angle of onset" or vertical nystagmus and that, with cannabis usage, he "wouldn't expect to see" those indicators.

The first pulse measurement Officer Abrusci took was sixty-two beats per minute, which was "at the low end of average ranges" of sixty-to-ninety beats per minute.  The second measurement was sixty-four beats per minute, and the third was sixty-two.  Officer Abrusci testified a person under the influence of cannabis would have a pulse "on the high side, or elevated."

During step five, which included the Romberg Balance, walk-and-turn, and one-leg-stand tests, Officer Abrusci observed defendant "had eyelid

---

[5]  Horizontal Gaze Nystagmus is the name for abnormal eye movements that are a sign of intoxication.  Nat'l Traffic L. Ctr., Nat'l Dist. Att'ys Ass'n, Horizontal Gaze Nystagmus:  The Science and the Law 1 (2d ed. 2021).

A-2044-19

tremors, he had about a one[-]inch sway, side to side from center . . . and [a] one[-]inch sway front to back from center." When he asked defendant to close his eyes for thirty seconds, he opened his eyes at eighteen seconds and, when the officer asked him "how he estimated the time," defendant said "that he just counted, that he got to [twenty-five] and thought that he was counting slowly and opened his eyes, thinking that he had already gotten to [thirty] seconds."

Officer Abrusci testified "eyelid tremors are commonly observed in people that have smoked cannabis" and swaying from side-to-side can be consistent with cannabis use. He also opined that defendant misjudging the time showed his "perception of time, his reaction time were . . . affected," which was consistent with cannabis use.

Defendant had leg tremors during the walk-and-turn test both in the starting position and while walking, which was an indicator of cannabis usage. He had to stop to regain his balance a couple of times, "stepped off the line to his left" when taking his fifth step, failed to pivot in a directed fashion, and took fewer steps than directed—all of which were consistent with cannabis use.

During the one-leg-stand test, Officer Abrusci again observed "noticeable leg tremors." Defendant "was able to keep his foot up" and "count to [twenty-eight] in [thirty] seconds," which was "not a . . . problematic observation," but

the officer noted that defendant "swayed and he was hopping while doing the test, trying to keep his balance." The same thing occurred when defendant did the one-leg-stand test with his other leg.

During the finger-to-nose test, Officer Abrusci again observed eyelid tremors and swaying. Defendant used the pad rather than the tip of his finger when touching his nose and, "on a couple of the attempts he didn't touch the tip of his nose but touched other areas of his nose that were not . . . in accordance with the directions."

During step six, Officer Abrusci measured defendant's temperature at 97.3 degrees, which was below the average range of 98.6 plus or minus one degree. This was inconsistent with cannabis use and "actually helped to . . . point towards a narcotic." Defendant's blood pressure was 118/72. Officer Abrusci noted "118 was below the average ranges of 120 to 140, and a blood pressure at [seventy-two was] at the low end of average ranges of [seventy] to [ninety]." These readings were, "again, not consistent with marijuana, but . . . another indicator, point[ing] towards the direction of a narcotic."

Officer Abrusci measured defendant's pupils in regular room light and found them to be two millimeters, which was below the average range of 2.5 to five millimeters. He then took defendant into an adjacent room for a "dark room

exam." After more than ninety seconds, defendant's pupils "only opened up a half a millimeter to two and a half millimeters," which was below the average of five millimeters to 8.5 millimeters and showed "basically little to no reaction . . . to the change in light." When Officer Abrusci shined a penlight into defendant's eyes, they constricted to two millimeters. He concluded defendant's pupil reactions were "consistent with narcotics," not "straight marijuana" usage.

Officer Abrusci examined defendant's mouth and nostrils with a penlight and ultraviolet light to check for recency of drug usage. He observed a green color that "was consistent with somebody that's recently smoked marijuana," and observed "residue" under the ultraviolet light also "consistent with somebody who's recently ingested or smoked marijuana." He testified it was during the dark room examination, while he was telling Officer Brunone the significance of his ultraviolet light observations, that defendant volunteered he had smoked cannabis from the pipe found in his car "a few hours" before the stop.[6]

---

[6] Defendant denied ever telling either officer he had smoked cannabis on the day of his arrest, but during cross-examination he admitted he had smoked cannabis at 9:00 a.m. that day.

Based on the DRE evaluation and the totality of the circumstances, Officer Abrusci concluded defendant had been driving under the influence of "[a] combination of narcotics and cannabis" that would have "affected his ability to operate the motor vehicle." Defendant was eventually taken to another police station for an Alcotest procedure that showed his blood alcohol concentration (BAC) was 0.00%.

Following defendant's conviction in municipal court, he appealed, and the Law Division conducted a trial de novo on the record. The court denied defendant's motion to suppress the physical evidence, granted the State's motion to admit defendant's statements, found defendant guilty of the same charges[7] as the municipal court, and imposed the same penalties.

The court issued a written opinion concluding the officers were justified in stopping defendant's vehicle based on the observations of him speeding and

---

[7] In addition to the DUI charge, the other charges included: possession of less than fifty grams of marijuana, N.J.S.A. 2C:35-10(a)(4); failure to turn over a controlled dangerous substance to law enforcement, N.J.S.A. 2C:35-10(c); possession of drug paraphernalia, N.J.S.A. 2C:36-2; driving under the influence of marijuana, N.J.S.A. 2C:35-10(b). We granted the State's motion to remand for entry of an amended judgment given the passage of New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, N.J.S.A. 24:61-31 to -56. The Law Division subsequently dismissed the N.J.S.A. 2C:35-10(a)(4); N.J.S.A. 2C:35-10(c); N.J.S.A. 2C:36-2; and N.J.S.A. 2C:35-10(b) convictions.

the abrupt lane change without signaling. It found the officers were justified to broaden the inquiry because of the marijuana odor emanating from the vehicle "partially masked by the smell of the air fresheners," the observation of shake on the car floor, and defendant's nervousness, red eyes, and droopy eyelids. The odor and the substance on the floor "provided the officers with probable cause to search the vehicle." Therefore, the warrantless search yielding the pipe and the cannabis was justified under the automobile exception.

The court admitted the statement defendant made following his arrest that he smoked marijuana earlier in the day. It reasoned he had received multiple Miranda warnings, "was aware of his Miranda rights, knew full well how to assert them, and knowingly and voluntarily waived those rights when answering Officer Abrusci's questions."

The court rejected defendant's argument the law required corroborating toxicology for a DRE opinion to be admissible. It recounted defendant's performance during the DRE evaluation and credited Officer Abrusci's opinion that defendant "operated his vehicle under the influence of marijuana" and "that [d]efendant's ability to [operate] his vehicle would have been impaired." It noted an officer's subjective observation "is a sufficient ground to sustain an

under the influence or DWI conviction." The court found the totality of the circumstances, including the

> observations of [d]efendant at the scene by Officers Abrusci and Brunone, the odor of raw marijuana, the recovery of marijuana and a glass pipe from [d]efendant's car, [d]efendant's own admissions that he ha[d] smoked marijuana earlier that day, and Officer Abrusci's testimony regarding his examination of [d]efendant at police headquarters, [show] the State has established beyond a reasonable doubt that [d]efendant was under the influence of marijuana in violation of N.J.S.A. 2C:35-10(b); and DWI in violation of N.J.S.A. 39:4-50(a).

Defendant raises the following points on appeal:

> I. THE [OFFICERS'] ROADSIDE AND POST– ROADSIDE WARRANTLESS CUSTODIAL DETENTION WAS AN UNREASONABLE AND UNCONSTITUTIONAL SEIZURE OF . . . DEFENDANT'S PERSON.
>
> a. GENERALLY.
>
> b. FRUITS OF THE POISONOUS TREE DOCTRINE.
>
> c. THE PROLONGED WARRANTLESS ROADSIDE DETENTION OF . . . DEFENDANT WAS UNREASONABLE.
>
> d. [OFFICER] ABRUSCI'S WARRANTLESS STATIONHOUSE SO CALLED "DRUG RECOGNITION EVALUATION" WHICH HE CONDUCTED UPON . . . DEFENDANT'S PERSON IS A

17

A-2044-19

"SEARCH" UNDER THE [FOURTH] AMENDMENT NOT SUBJECT TO ANY LAWFULLY RECOGNIZED EXCEPTION.

II. [OFFICER] ABR[U]SCI'S SO CALLED "DRUG RECOGNITION EVALUATION" IS INADMISSIBLE JUNK SCIENCE PERFORMED AND EVALUATED BY AN INCOMPETENT INDIVIDUAL.

a. ADMISSIBILITY OF SCIENTIFIC EVIDENCE GENERALLY.

b. ADMISSIBILITY OF EXPERT WITNESS TESTIMONY GENERALLY.

c. THE STATE FAILED TO ESTABLISH THAT [OFFICER] ABRUSCI WAS AN "EXPERT" IN ANY FIELD OTHER THAN DETECTING ALCOHOL INTOXICATION OR THE ABSENCE THEREOF.

III. THE STATE FAILED TO PROVE . . . DEFENDANT'S GUILT OF DRIVING WHILE INTOXICATED (N.J.S.A. 39:4-50(A)) BEYOND A REASONABLE DOUBT.

IV. . . . DEFENDANT DID NOT RECEIVE A FAIR AND UNBIASED TRIAL (ARGUMENTS TRUNCATED BECAUSE OF RESTRICTIONS ON LENGTH OF BRIEF). (Raised Below).

a. SPEEDY TRIAL RIGHTS WERE VIOLATED.

b. DISCOVERY VIOLATIONS NEVER RULED UPON BY THE TRIAL COURT OR THE LAW DIVISION (DELAY,

18

CONCEALMENT AND DESTRUCTION OF EVIDENCE).

c. FAILURE TO RULE ON THE N.J.R.E. 104 AND SUPPRESSION MOTION PRIOR TO THE CONCLUSION OF THE PRESENTATION OF TRIAL EVIDENCE.

d. THE TRIAL WAS NOT A FAIR TRIAL.

    i. JUDGE AND STATE PROLONGED THE TRIAL.

    ii. THE JUDGE WAS BIASED IN FAVOR OF THE STATE.

        1. INTIMIDATED, DISRESPECTED AND DISMISSIVE OF DEFENSE COUNSEL;

        2. ASSISTED THE STATE WITH ITS CASE;

        3. HELD THE STATE TO A LOWER STANDARD;

        4. REJECTED DEFENSE EXPERT TESTIMONY WITHOUT CAUSE.

    iii. [OFFICER] ABRUSCI WAS THE MUNICIPAL PROSECUTOR'S FORMER PRIVATE PRACTICE CLIENT.

19

I.

Following a de novo appeal to the Law Division, conducted on the record developed in the municipal court, our scope of review is limited. State v. Clarksburg Inn, 375 N.J. Super. 624, 639 (App. Div. 2005); see also R. 3:23-8(a)(2). We consider only "the action of the Law Division and not that of the municipal court." State v. Palma, 219 N.J. 584, 591-92 (2014) (quoting State v. Joas, 34 N.J. 179, 184 (1961)). The Law Division judge must make independent findings of fact and conclusions of law based on the evidentiary record of the municipal court, with deference to the municipal court judge's ability to assess the witnesses' credibility. State v. Johnson, 42 N.J. 146, 157 (1964). This is because the municipal court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting Johnson, 42 N.J. at 161).

In turn, we focus our review on "whether there is 'sufficient credible evidence . . . in the record' to support the trial court's findings." State v. Robertson, 228 N.J. 138, 148 (2017) (quoting Johnson, 42 N.J. at 162). However, our review of legal determinations is plenary. See State v. Kuropchak, 221 N.J. 368, 383 (2015).

II.

In Point III, defendant argues the State failed to meet its burden of proof to show he was guilty of DUI beyond a reasonable doubt. He points to the fact his BAC was 0.00%, he was acquitted of the N.J.S.A. 2C:35-10(b) offense, and there was "no objective or corroborating toxicology evidence at trial." He asserts he was convicted solely because of Officer Abrusci's "unfounded 'hunch' that [he] was under the influence of marijuana."

Pursuant to N.J.S.A. 39:4-50(a), "[a] person who operates a motor vehicle while under the influence of intoxicating liquor, narcotic, hallucinogenic or habit-producing drug, or operates a motor vehicle with a [BAC] of 0.08% or more" is guilty of DUI. The Court in Olenowski II explained:

> The statute has a vital purpose. It "seeks to prevent the operation of motor vehicles by those whose faculties are so impaired as to present a danger to the safety of others as well as themselves." State v. DiCarlo, 67 N.J. 321, 325 (1975). In enacting N.J.S.A. 39:4-50, "[t]he obvious intention of the Legislature was to prescribe a general condition, short of intoxication, as a result of which every motor vehicle operator has to be said to be so affected in judgment or control as to make it improper . . . to drive on the highways." [Johnson, 42 N.J. at 164-65] (noting that even "the smallest amount of alcohol has some slight effect or influence on an individual" and that being "absolutely 'drunk'" is not a statutory requirement).

21

[255 N.J. at 547 (first alteration in original) (footnote omitted).]

"[W]hether the cause of intoxication is alcohol or narcotics, hallucinogens or habit-forming drugs is largely irrelevant." Id. at 547-48 (quoting State v. Bealor, 187 N.J. 574, 588 (2006)). However, while "a driver whose BAC level exceeds the 0.08% limit prescribed by N.J.S.A. 39:4-50 is guilty – per se – of driving while intoxicated, . . . [t]here is no equivalent per se violation in this state for persons who drive with impairment-causing drugs in their system." Id. at 548. "The critical phrase 'under the influence' within N.J.S.A. 39:4-50 is 'not self-defining and [has] required judicial ascertainment of the legislative intent.'" Ibid. (quoting Johnson, 42 N.J. at 164).

The Court has further explained as follows:

> The language "under the influence" . . . means a substantial deterioration or diminution of the mental faculties or physical capabilities of a person whether it be due to intoxicating liquor, narcotic, hallucinogenic or habit-producing drugs. In [Johnson], an intoxicating liquor case, we stated that "under the influence" meant a condition which so affects the judgment or control of a motor vehicle operator as to make it improper for [them] to drive on the highway. . . . [I]n [DiCarlo], we held that an operator of a motor vehicle was under the influence of a narcotic drug within the meaning of N.J.S.A. 39:4-50(a) if the drug produced a narcotic effect "so altering [their] normal physical coordination and mental faculties as to render such person a danger

22

to [themselves] as well as to other persons on the highway."

[State v. Tamburro, 68 N.J. 414, 420-21 (1975) (emphasis added).]

Tamburro remains vital today. See Bealor, 187 N.J. at 589 (quoting the definitions cited in Tamburro and noting the State must prove beyond a reasonable doubt the unsafe effect on the defendant's physical or mental capabilities); Olenowski II, 255 N.J. at 549 (quoting Tamburro definitions). "[T]he State must prove in [driving under the influence of drugs] cases that (1) the defendant was intoxicated and (2) the cause of the intoxication was either narcotics, hallucinogens, or habit-producing drugs." Olenowski II, 255 N.J. at 550. Pursuant to these principles, we conclude the municipal court judge and the Law Division erred as a matter of law when they found that proof of cannabis use alone was sufficient to meet the State's burden of proof.

The municipal court judge applied the incorrect standard when he held "the current state of the law" was that "if a defendant smokes marijuana and they operate a vehicle, they are under the influence while operating a motor vehicle" and rejected the argument defendant could have "used marijuana at some point in time . . . on the date in question" yet not be guilty of violating N.J.S.A. 39:4-50(a). The judge ignored that a finding of "under the influence" requires proof

23                                                                    A-2044-19

that use of a drug caused "a substantial deterioration or diminution of the mental faculties or physical capabilities of a person," "a condition which so affects the judgment or control of a motor vehicle operator as to make it improper for him to drive on the highway," or "a narcotic effect 'so altering his or her normal physical coordination and mental faculties as to render such person a danger to [themselves] as well as to other persons on the highway.'" Tamburro, 68 N.J. at 420-21 (quoting DiCarlo, 67 N.J. at 328). See also Bealor, 187 N.J. at 589 (noting Tamburro definitions applicable to DWI and DUI prosecutions); Olenowski II, 255 N.J. at 549 (same).

The Law Division similarly overlooked the law when it noted Officer Abrusci "opined . . . [d]efendant's ability to [operate] his vehicle would have been impaired," yet made no finding as to the nature or degree of defendant's alleged impairment. Like the municipal court, it rejected Officer Abrusci's opinion the signs and symptoms of drug use observed in defendant were due to "[a] combination of narcotics and cannabis" but erred because it made no findings whether the impairment was because of cannabis use.

N.J.S.A. 39:4-50(a) requires proof of alcohol or drug use, proof of impairment, and a causal link between the two. See, e.g., State v. Bealor, 377 N.J. Super. 321, 328 (App. Div. 2005), rev'd on other grounds, 187 N.J. 574

(2006) (noting the State was obliged to prove beyond a reasonable doubt that drug use "was the proximate cause of defendant's behavior"); State v. Franchetta, 394 N.J. Super. 200, 206 (App. Div. 2007) (noting conviction of DUI is appropriate where the defendant was physically impaired to the point of being unable to drive and "the State proved beyond a reasonable doubt that cocaine was the proximate cause" of impairment). Although the specific type of drug ingested need not be proven in a DUI case, impairment must be shown "from the subject's conduct, physical and mental condition and the symptoms displayed," Tamburro, 68 N.J. at 421, and that impairment must result from a "narcotic, hallucinogenic or habit-producing drug." N.J.S.A. 39:4-50(a). Because these essential findings regarding the elements of the DUI offense were not made, we are constrained to reverse and vacate defendant's conviction.

Moreover, our review of the record reveals the State's evidence was insufficient to prove defendant was operating his vehicle while impaired by drugs. The evidence shows defendant was speeding and made an abrupt lane change without signaling. However, no link was drawn between these infractions and drug use. Officer Abrusci did not connect the signs of cannabis use or any of the signs and symptoms he opined were consistent with drug use to defendant's driving. Although he testified his testing of defendant

25

demonstrated a lack of perfect motor control and perception, he did not explain how, or to what extent, defendant's signs and symptoms showed "substantial deterioration or diminution of . . . mental faculties or physical capabilities," a significant impact on "judgment or control of a motor vehicle," Tamburro, 68 N.J. at 420-21, or a meaningful alteration of "normal physical coordination and mental faculties." Ibid. (quoting DiCarlo, 67 N.J. at 321). He did not explain how a person who had not used any drugs would score on the tests he administered to defendant.

In short, none of the signs and symptoms Officer Abrusci testified to were correlated to an adverse impact on defendant's driving. The evidence was insufficient to prove defendant operated the vehicle while impaired by drugs. For these reasons as well, we reverse and vacate defendant's conviction.

III.

In Point I, defendant argues: 1) the State failed to establish he knowingly and voluntarily waived his rights to remain silent and to counsel; 2) the officers had no basis to detain him roadside and the prolonged detention between the initial traffic stop and his arrest was unconstitutional; and 3) the DRE examination required a search warrant or a finding the examination fell under

an exception to the warrant requirement. We find no merit to the two latter arguments and address only the first one.

Defendant contends the municipal court judge erred in refusing to find a <u>Miranda</u> violation and suppressing his admissions about smoking cannabis earlier in the day. He asserts the Law Division also erred because it gave short shrift to this argument.

"An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" <u>State v. Boone</u>, 232 N.J. 417, 425-26 (2017) (quoting <u>State v. Scriven</u>, 226 N.J. 20, 40 (2016)). Factual findings should be overturned "only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" <u>Elders</u>, 192 N.J. at 244 (quoting <u>Johnson</u>, 42 N.J. at 162). We owe no deference to conclusions of law, which we review de novo. <u>Boone</u>, 232 N.J. at 426.

"Before the police can interrogate a suspect in custody, they must inform the person of his constitutional rights in accordance with <u>Miranda</u>." <u>State v. O.D.A.-C.</u>, 250 N.J. 408, 420 (2022) (citing <u>State v. Hreha</u>, 217 N.J. 368, 382 (2014)). <u>Miranda</u> protects a suspect's right against self-incrimination based

upon "the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "New Jersey's privilege against self-incrimination is so venerated and deeply rooted in this state's common law" that it is regarded "as though it were of constitutional magnitude." State v. Rivas, 251 N.J. 132, 153 (2022) (quoting State v. O'Neill, 193 N.J. 148, 176-77 (2007)). See also, e.g., State v. Wright, 444 N.J. Super. 347, 363-64 (App. Div. 2016) (noting New Jersey courts have treated the state privilege as though of constitutional magnitude and have found that its protection is broader than its Fifth Amendment federal counterpart).

"A defendant's statement to the police, made in custody, is admissible if it is given freely and voluntarily, after the defendant received Miranda warnings, and after he knowingly, voluntarily, and intelligently waived his rights." O.D.A.-C., 250 N.J. at 413. The burden is on the State to prove, beyond a reasonable doubt, that a defendant's waiver of rights was valid. Ibid. See also, e.g., State v. Sims, 250 N.J. 189, 211 (2022) (the State must show, given the "totality of the circumstances," that waiver was knowing, voluntary, and intelligent), reconsideration denied, 250 N.J. 493 (2022), and cert. denied, __

U.S. __ (2022). "Courts look to the totality of the circumstances to assess whether the State has met its burden." O.D.A.-C., 250 N.J. at 413.

However, where there is no waiver and a defendant invokes their right to remain silent, it must be "scrupulously honored." Michigan v. Mosely, 423 U.S. 96, 103-04 (1975). "[T]he requirement that the police 'scrupulously honor' the suspect's assertion of [their] right to remain silent is independent of the requirement that any waiver be knowing, intelligent, and voluntary" and should be addressed first. State v. Hartley, 103 N.J. 252, 261 (1986) (citing Mosely, 423 U.S. at 102-03). See also State v. Mallon, 288 N.J. Super. 139, 148 (App. Div. 1996) (noting the trial judge "focused solely upon defendant's waiver" and failed to make "the critical inquiry" of whether his rights had been scrupulously honored).

Here, the municipal court judge found defendant waived his Miranda rights because he agreed to being questioned after invoking his rights to counsel and to remain silent. However, the judge did not resolve the conflicting evidence, namely, the fact defendant had checked "no" on the Miranda form, with Officer Abrusci's testimony that defendant agreed to answer his questions. Instead, the judge found there had been no "interrogation" by the police following defendant's invocation of his rights, because defendant's statements

were made during the DRE examination. The Law Division found the municipal court correctly concluded defendant's <u>Miranda</u> rights were not violated.

We are constrained to reverse because neither court adjudicated whether the officers scrupulously honored defendant's right to remain silent. Interrogation or not, the substantial, credible evidence in the record readily shows Officer Abrusci continued questioning defendant after he repeatedly and unambiguously invoked his right to speak to his attorney. Officer Abrusci acknowledged as much when he testified he altered the DRE evaluation to exclude what he considered to be incriminating questions. While the officer may have had good intentions, once defendant asked for counsel and indicated he did not want to answer questions on the <u>Miranda</u> rights form, all interrogation had to cease.

Although Officer Abrusci believed asking questions about defendant's medical background did not flout the right against self-incrimination, the Court in <u>Olenowski II</u> explained: DREs are "trained . . . to ask drivers during the protocol about whether they have medical conditions or about other causes that might impair them or affect their performance on the field sobriety tests," not to render a medical diagnosis or offer medical assistance, but so that they can better form and confirm their drug-use opinion. 255 N.J. at 587-88. DREs are trained

to be aware of the major non-drug causes of impairment that may mimic signs of drug or alcohol impairment (e.g., head trauma, low blood sugar in diabetics, seizures and neurological disorders, conjunctivitis, some mental health issues, and "physical defects" like injuries that might affect performance of certain steps of the protocol).

[Id. at 588.]

Therefore, Officer Abrusci's questions were not just for medical background. They touched upon the element of impairment the State needed to show a DUI violation. Although Officer Abrusci could have proceeded with the observational and physical-testing aspects of the DRE protocol without violating defendant's Miranda rights, he could not question defendant in any manner once defendant invoked his rights.

Furthermore, we part ways with the municipal court's findings there was no interrogation. Officer Abrusci's comments to Officer Brunone while examining defendant under ultraviolet light in the darkroom were the functional equivalent of interrogation.

In Rhode Island v. Innis, 446 U.S. 291, 301 (1980), the Court explained that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

31                                                                  A-2044-19

reasonably likely to elicit an incriminating response from the suspect." (footnote omitted).  See also State v. Bey, 112 N.J. 45, 68 n.13 (1988) (holding "[t]he initiation of a general discussion about the victim clearly satisfies" the Innis standard).

Regardless of Officer Abrusci's reasons for conveying his observations to Officer Brunone, it is obvious that it would elicit a response from defendant, who was listening to the incriminating evidence the officer was finding.  The State never proffered a reason for the commentary.  Officer Brunone was not a DRE or in training to become one.  He had no need to observe the process or discuss Officer Abrusci's observations.

Because we find there was both an interrogation and that defendant unequivocally invoked his rights to counsel and to remain silent, his admissions about smoking cannabis should have been suppressed.  And because Officer Abrusci's DRE opinion was based in part on defendant's admissions, his DRE evaluation and opinion should have been excluded, as fruits of the poisonous tree.  O'Neill, 193 N.J. at 171 n.13.  Given that the DRE opinion was the only evidence defendant was driving with cannabis in his system, the State could not prove the elements of N.J.S.A. 39:4-50(a).  For these reasons as well, we reverse and vacate defendant's conviction.

32

IV.

In Point II, defendant argues the DRE evaluation and testimony should have been excluded because it was based on "inadmissible junk science" that could not properly support an expert opinion. We are unpersuaded.

The claim in Olenowski was that the DRE evaluations that were admitted into evidence against the defendant in two municipal court matters should have been excluded as scientifically unreliable by the standards articulated in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), which New Jersey courts had used in criminal cases for decades to evaluate the reliability of scientific expert testimony. State v. Olenowski, 253 N.J. 133, 138-40 (2023) (Olenowski I). The Court granted certification to decide "whether the testimony of an officer who is a certified . . . []DRE[] is admissible at trial and, if so, under what circumstances." Id. at 139 (quoting State v. Olenowski, 247 N.J. 242, 242 (2019)). After the initial argument, the Court concluded "the existing factual record [wa]s inadequate to test the validity of DRE evidence," and designated a special master to conduct "a plenary hearing to consider and decide whether DRE evidence has achieved general acceptance within the relevant scientific community and therefore satisfies the reliability standard of N.J.R.E. 702." Id. at 140 (quoting Olenowski, 247 N.J. at 244).

33

Then, the Court considered the continuing viability of the <u>Frye</u> standard for criminal cases and remanded again for the special master to consider the defendant's claims applying "a <u>Daubert</u>-type[8] standard in criminal cases." <u>Id.</u> at 153, 155. On remand, the special master concluded DRE testimony was reliable and admissible under the <u>Daubert</u> standard adopted in <u>Olenowski I</u>. <u>Olenowski II</u>, 255 N.J. at 545. The Court adopted the special master's conclusions with some "modifications and limitations." <u>Id.</u> at 546. It held

> the record as a whole justifies the admission of DRE testimony, with the following four limitations and safeguards:
>
> • The DRE testimony must be confined to an opinion that the evaluation is "consistent with" the driver's ingestion or usage of one or more of the identified drug categories. The DRE may not present opinions as to whether the driver's observed impairment was actually caused by such drugs and, if so, to what extent.
>
> • If feasible, the State must make a reasonable attempt to obtain a toxicology report based on a blood or urine sample from the driver. If the State fails to make such a reasonable attempt without a persuasive justification, the DRE opinion testimony must be excluded.

---

[8] <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).

• The defense must be afforded a fair opportunity to impeach the DRE and present competing proofs.

• Model instructions to guide juries about DRE evidence should be considered.

[Ibid.]

For these reasons, we reject defendant's assertions regarding the nature of DRE evidence. Moreover, the DRE evidence here was admissible under the standard adopted in Olenowski II, because: Officer Abrusci repeatedly testified that specific signs or symptoms were "consistent with" cannabis or narcotic use rather than "caused" by the drugs; defendant affirmatively refused to provide a urine sample, which he had a right to do, so obtaining a toxicological sample was not feasible; defendant was afforded but waived the opportunity to cross-examine Officer Abrusci regarding the DRE evaluation; and the Court's advice regarding jury instructions was inapplicable as this matter was a bench trial.

V.

Finally, we decline to address the arguments raised by defendant in Point IV because they have not been briefed. "An issue not briefed on appeal is deemed waived." Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011).

Reversed and vacated. We do not retain jurisdiction.

35

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2044-19